742 So.2d 699 (1999)
STATE of Louisiana
v.
Shannon J. ZENO.
No. 99-KA-69.
Court of Appeal of Louisiana, Fifth Circuit.
August 31, 1999.
*702 Katherine M. Franks, Louisiana Appellate Project, Baton Rouge, Louisiana, Attorney for Appellant, Shannon J. Zeno.
Paul D. Connick, Jr., District Attorney, Ellen S. Fantaci, Terry M. Boudreaux, Joseph E. Roberts, Dominick Tamburo, Assistant District Attorneys, Twenty-fourth Judicial District Court, Gretna, Louisiana, Attorneys for Appellee, State of Louisiana.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY and SUSAN M. CHEHARDY.
CHEHARDY, Judge.

STATEMENT OF THE CASE
On April 3, 1998, defendant, Shannon Zeno, and three co-defendants, Jermal Anderson, Noel Knight, and Keith Sterling, were charged by bill of information with conspiracy to commit armed robbery (Count 1), in violation of La. R.S. 14:26 and 64; and armed robbery (Count 2), in violation of La. R.S. 14:64.[1] Defendant pled not guilty.
On July 20-22, 1998, defendant was tried by a jury of twelve persons, which found defendant guilty as charged on both counts. On July 27, 1998, the trial court denied defendant's motions for post verdict judgment of acquittal and new trial. After defendant waived delays, the trial court sentenced defendant on the conspiracy conviction to serve forty-nine years and six months at hard labor without benefit of parole, probation, or suspension of sentence. For the armed robbery conviction, the trial court sentenced defendant to serve ninety-nine years at hard labor without benefit of parole, probation or suspension of sentence, and further ordered the sentences to run consecutively with each other and with any other sentence defendant may be serving.
On July 27, 1998, the state filed an habitual offender bill of information, alleging defendant to be a third felony offender, and defendant denied the allegations. After a hearing on August 13, 1998, the trial court found defendant to be a third felony offender, vacated the armed robbery conviction, and imposed a life sentence without benefit of parole, probation or suspension of sentence to run consecutively with defendant's conspiracy sentence. Defendant timely appealed.

FACTS
On February 14, 1998, at approximately 11:00 p.m., two men committed armed robbery at Wholesale Direct of Louisiana, a business in Jefferson Parish. Approximately $8,000.00 in cash and $1,000.00 in checks was stolen, as well as a diamond ring valued at $3,000.00. At the time of the armed robbery, most of the employees had left for the day. The owner of the business, Juanita Scroggin, and one of her *703 employees, Francis Klein, were reconciling accounts. Two other employees, Noel Knight and Jermal Anderson, arrived at the business while the ladies were finishing the accounts.
Ms. Scroggin testified at trial that she asked Knight and Anderson to lock up the business. Ms. Scroggin went into her office, and as she reached for her keys on her desk, she was struck in the back so hard that she hit the wall, fell over her desk and slumped into her chair. She looked up and saw a man dressed in black wearing a ski mask and gloves. The man thrust a sawed-off rifle into her and told her to give him the "f* * *ing money," or he would blow her head off. When Ms. Scroggin attempted to comply, the man grabbed her by the hair and pulled her across the desk. As Ms. Scroggin attempted to gain her balance, she noticed Ms. Klein standing in the doorway with her hands over her face, which was covered in blood. The second man, who was also dressed in black and wearing a ski mask, shoved Ms. Klein into Ms. Scroggin, and then went across the hall.[2]
The man with the rifle ordered the women to get to the floor and then taped the two women together, facing each other, with duct tape. Ms. Scroggin testified that Ms. Klein was bleeding profusely and was making "gurgling" sounds, as if she was having difficulty breathing. While the gunman taped their hands behind their backs, Ms. Scroggin tried to twist her diamond ring around her finger and close her hand so as to conceal the diamond. The gunman told her to open her hand or he would cut her finger off to get her ring. When she opened her hand, the gunman took her ring.
After taping Ms. Scroggin and Ms. Klein together, the gunman rummaged through Ms. Scroggin's desk searching for money. When the gunman saw Ms. Scroggin watching him, he told her to put her head down or he would blow her head off. The gunman then demanded to know where the rest of the money was kept. When Ms. Scroggin did not answer, one of the two men said: "Get the briefcase. Where's the briefcase?" At that point, the phone started ringing and the gunman ripped the cord from the wall, put the gun to Ms. Scroggin's head, and threatened to kill her if she did not tell him where the rest of the money was.[3]
The gunman eventually left the room, turning the lights off and locking the door. Ms. Scroggin and Ms. Klein lay taped together on the floor waiting for help. Eventually, the women were freed by Noel Knight, who said that he had also been taped, but managed to free himself by cutting through the tape with his ring. Ms. Scroggin testified that Knight and Anderson said that they had been held in the office of another employee, Mike Swenson. Ms. Scroggin further testified that it was common knowledge among the employees that Mike Swenson kept the business money in a maroon briefcase.
After being freed, Ms. Scroggin called the police. Deputy Stacy Poche was the first officer on the scene. Deputy Poche testified that Ms. Klein had been hit in the face so hard that some of her teeth had been knocked out and some were still dangling in her mouth. Deputy Poche also testified that she overheard Jermal Anderson, one of the alleged victims, say to Noel Knight, the other alleged victim: "I can't believe they hit me."
Lieutenant Norman Schultz also responded to the scene that night. Lieutenant Schultz testified at trial that Anderson's comment to Knight raised a suspicion that Anderson and Knight may *704 have had some involvement in the robbery. While Anderson initially denied prior knowledge of the robbery, he later admitted in a statement to the police that Knight brought up the idea of committing a robbery at Wholesale Direct during a recent trip to Baton Rouge with Anderson and his cousin, Keith Sterling. Anderson also told the police that he recognized the voice of the gunman as that of defendant, Shannon Zeno.
A few days after the armed robbery, the police discovered a sawed-off rifle, a black jacket, black gloves, a two-way radio, and a black cap on the railroad tracks a few blocks from Wholesale Direct. The rifle was identified by Ms. Scroggin at trial as the one used in the robbery.
Keith Sterling also gave a statement to the police, and confirmed that the armed robbery was discussed on the trip to Baton Rouge a few days earlier. He stated that after returning to his house from Baton Rouge, he and Anderson were discussing the robbery further, and were overheard by defendant, who was dating Sterling's aunt and stayed at the house occasionally. Sterling told the police that defendant asked several questions about the possible robbery, and Sterling told defendant that Wholesale Direct would be an easy place to rob.
On February 18, 1998, a search warrant for the Sterling residence and a warrant for defendant's arrest were obtained. The officers set up a surveillance of the residence to watch for defendant. Detective William Jones testified at trial that the officers followed defendant from the residence in a green Toyota Corrolla. The officers attempted to apprehend defendant, but defendant stopped the vehicle and fled on foot. After securing the vehicle, the officers obtained a warrant to search it, and found $1,945.00 in cash and a handwritten "shopping list." The Sterling residence was also searched. Black clothing, duct tape, and a ring were recovered. Defendant was arrested the following month.

ASSIGNMENT OF ERROR NUMBER ONE
The evidence is insufficient to establish the elements of the offense of conspiracy or to establish beyond a reasonable doubt that Shannon Zeno participated in either the alleged conspiracy to commit the armed robbery of Wholesale Direct or the actual armed robbery of the owner.

DISCUSSION
When an appellate court reviews a claim of insufficient evidence, the relevant inquiry is whether the trial evidence, direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Defendant alleges that the evidence was insufficient to support his conspiracy conviction because there was no evidence to show the element of an "agreement." The elements of the crime of conspiracy are: (1) an agreement or combination of two or more persons for the specific purpose of committing a crime, plus (2) an act done in furtherance of the object of the agreement or combination. La. R.S. 14:26.
Specific intent is an essential element of conspiracy. State v. Ellis, 94-599 (La.App. 5 Cir.5/30/95), 657 So.2d 341, 361, writs denied, 95-2095 (La.12/8/95), 664 So.2d 421 and 95-1639 (La.1/5/96), 666 So.2d 300. Specific intent is defined as "... that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). The determination of specific criminal intent is a question of fact and may be inferred from circumstances and actions of the defendant. State v. Armant, 97-1256 (La.App. 5 Cir.5/27/98), 719 So.2d 510, 517, writs denied, 98-1884 (La.11/20/98), 729 So.2d 3 *705 and 98-1909 (La.11/20/98), 729 So.2d 4. Proof of a conspiracy may be made by direct or circumstantial evidence. State v. Ellis, supra.
Keith Sterling testified at trial that during the trip to Baton Rouge on February 12, 1998, with Jermal Anderson and Noel Knight, Knight told them that Wholesale Direct would be an "easy" place to commit a robbery. He said there would be about $30,000.00 at the business at the end of Valentines' Day, since the business was selling roses that day. Knight told Anderson and Sterling that the "guy that owned the place kept all his money and the proceeds from the job in his briefcase." Sterling further testified that Knight drew a diagram of the business and showed it to them. Sterling said that Knight asked if he knew anyone who could commit the robbery, and he told Knight that he knew someone who was "crazy enough to do it."
When they returned from Baton Rouge, Anderson and Sterling went to Sterling's residence and further discussed the robbery. They talked about the money being in the briefcase, how to "get in and get out," and the number of people who would be inside of the business at the time. Sterling testified that defendant overheard this conversation, and asked specific questions as to how much money there would be, where it would be and what day it would be there.
Sterling testified that on the afternoon of Valentines' Day, defendant was at the Sterling residence with a man Sterling knew only as "Firee." Sterling testified that they were talking about the robbery and defendant asked Sterling the same questions regarding the amount of money and its location. Sterling further testified that defendant left the house in the evening and returned at approximately 1:00 a.m. Sterling stated the defendant placed some money on his dresser that night. Sterling also saw the defendant and "Firee" outside of the house, and saw a "table full of money" in the back room of the house.
Sterling further testified that Anderson telephoned the next day and told him that Wholesale Direct had been robbed. Anderson said that he thought defendant had done it because he recognized his voice and because of the dread locks hanging out of his mask. Sterling said Anderson told him that he had been hit in the back of the head, and that he wanted to "get [defendant] back for hitting him..." Two days later, Sterling gave Anderson money and he said he told Anderson that the money was from defendant for Anderson to "keep his mouth closed."
Anderson also testified at trial about the discussion of the robbery on the trip to Baton Rouge. Anderson confirmed that defendant asked specific questions about the robbery during the conversation at Sterling's residence and that he told defendant the money would be in a burgundy briefcase.
Anderson testified that on Valentine's Day, he and Knight returned to Wholesale Direct between 9:30 p.m. and 10:00 p.m. Anderson testified that Knight asked him if he was sure he would not change his mind about the robbery. Anderson said he replied that "he was not going to do it" and that he would not put his "life on the line like that." Later that evening, the two armed robbers entered the store while he and Knight were in Mike Swenson's office. Anderson said one of the men pointed a gun at him, and told him and Knight to get on the floor. Anderson identified defendant as that man. He said he recognized defendant by his voice and by the deadlocks protruding from the side and the back of defendant's hood. Anderson said that after taping him and Knight, defendant asked, "Where's the money? Where's the briefcase?" Anderson testified that defendant then went across the hall, returned, and then grabbed him and pushed him in his back.
Anderson also testified that on the day after the robbery, he called Sterling and *706 told him that he knew defendant had committed the robbery. He also testified that Sterling gave him $150.00 on the Tuesday following the robbery. Anderson admitted that he had given several conflicting statements to the police. He said that he initially lied to the police because he was afraid of defendant.
While defendant contends that the evidence necessary to prove the element of an agreement is lacking, the evidence presented at trial indicates otherwise. The testimony presented at trial supports the existence of an "agreement or combination of two or more persons for the specific purpose of committing" the armed robbery. The testimony showed that important details of the robbery, including the location of the business, the exact date and time the most money would be at the business, where the money was kept inside the business, how to get in and out of the business, and how many employees would be present were discussed among defendant, Anderson and Sterling. This information was also discussed among defendant, Stirling, and another co-conspirator known as "Firee." Further, the state presented evidence at trial which showed that defendant and "Firee" conspired together and used this information to actually carry out the armed robbery.
Additionally, the second element of conspiracy was proven through trial testimony, that "one or more of such parties does an act in furtherance of the object of the agreement or combination." Anderson testified at trial that defendant was one of the two armed robbers. Perpetration of the actual crime is certainly an act in furtherance of the object of the agreement.
In this assignment, defendant also argues that the evidence was insufficient to prove that he committed the armed robbery because Anderson's testimony identifying him as the perpetrator was not believable and because the state did not introduce any physical evidence connecting him to the robbery.
Armed robbery is defined in La. R.S. 14:64 as the "taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." Encompassed in proving the elements of the offense is the necessity of proving the identity of the defendant as the perpetrator. When the key issue in the case is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Rowan, 97-21 (La.App. 5 Cir.4/29/97), 694 So.2d 1052, 1054.
In this case, Anderson testified that he recognized defendant by his voice and his dread locks hanging from under his hood. Anderson also testified that he had known defendant for approximately a year and that he was familiar with defendant's voice.
We have previously held that a witness' identification of a defendant by voice or other distinguishing characteristics is identification sufficient to support a conviction. See State v. Vasquez, 98-898 (La.App. 5 Cir. 2/10/99), 729 So.2d 65 and the cases cited therein. In the matter before us, the evidence presented was sufficient to rule out any reasonable probability of misidentification.
Based on the foregoing, we find that the evidence in this case, when considered in the light most favorable to the prosecution, was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of armed robbery and conspiracy to commit armed robbery.

ASSIGNMENT OF ERROR NUMBER TWO
The trial judge erred in not informing the jury that the specific acts designated in the bill of information as the overt acts furthering the conspiracy were merely allegations of the state as to what overt acts it relied upon to establish the conspiracy. The jury charge as written told the *707 jury that if it found the allegations proven, then the conspiracy existed.

DISCUSSION
In this assignment, defendant claims that the trial judge improperly commented on the evidence during jury instructions by failing to inform the jury that the overt acts designated in the bill of information were merely the state's allegations. Defendant concedes that the bill of information alleging the overt acts was properly read to the jury. Defendant asserts, however, that the trial judge made an impermissible comment because she did not tell the jury that the overt acts were merely the state's allegations before reading the overt acts in the jury instructions.
In support of this position, defendant relies on State v. Colligan, 95-880 (La. App. 3 Cir.8/7/96), 679 So.2d 184, where the trial judge read the bill of information to the jury as part of a jury charge without informing the jury that he was only reading from the bill of information. However, the instant case is clearly distinguishable from Colligan because the trial judge prefaced her remarks by stating that "the indictment (sic) charges that the said Shannon Zeno, Jermal Anderson, Noel Knight, and Keith Sterling, did combine, conspire..."
The concern in Colligan was that the trial judge had conveyed to the jury his opinion that the defendant was guilty, since he did not tell the jury he was merely reading from the bill of information. That concern does not exist in this case, as the trial judge herein clearly informed the jury that she was reading from the bill of information. Additionally, the trial judge had previously instructed the jury that the bill of information was an accusation by the state, that it was not evidence, and had no probative value. For the foregoing reasons, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER THREE
The trial judge erred in allowing testimony regarding character into evidence in the form of a hearsay statement of an alleged coconspirator without requiring the state to establish a prima facie case of conspiracy or establish that the statement was given during the existence of the alleged conspiracy.

DISCUSSION
On direct examination of Anderson, the prosecutor asked why he had initially lied to the police about his involvement in the crime, and Anderson replied that he had lied because he was afraid of defendant. The prosecutor then asked why he was afraid, and Anderson replied, "Because, because of stuff I heard about [defendant]." Defense counsel objected to the testimony as hearsay. At a bench conference, the prosecutor stated that he intended to elicit testimony from Anderson that Sterling had told him defendant was dangerous. The prosecutor argued that what Sterling told Anderson would not constitute hearsay because it was a statement by a co-conspirator made during the conspiracy. The trial judge overruled the objection on this basis. Anderson then testified that Sterling had told him defendant was a dangerous person.
Under the Louisiana Code of Evidence, a statement by a co-conspirator is not hearsay if it is made while the person is participating in a conspiracy to commit a crime and if the statement was made in furtherance of the objective of the conspiracy, provided that a prima facie case of conspiracy has been established. La. C.E. art. 801(D)(3)(b); State v. Lobato, 603 So.2d 739, 747 (La.1992).
In the instant case, we find that Anderson's testimony about what Sterling told him does not fit within the cited exception. There is no indication in the record as to when Sterling made the statement. Additionally, the statement that defendant is a dangerous person was not made in furtherance of the objective of the conspiracy. Nevertheless, we find that *708 the statement is not hearsay under another exception to the hearsay rule.
Hearsay is defined as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La. C.E. art. 801(C). Hearsay is generally inadmissible as evidence. La. C.E. art. 802. However, when an out-of-court statement is offered for a purpose other than to establish the truth of the assertion, the statement is not hearsay. State v. Schexnayder, 96-98 (La.App. 5 Cir.11/26/96), 685 So.2d 357, 367, writ denied, 97-2251 (La.1/16/98), 706 So.2d 973.
It is clear from the record that the prosecution sought to have Anderson explain to the jury why he initially denied any involvement in, or knowledge of, the armed robbery, and thereafter changed his statement and implicated defendant. Anderson's testimony that Sterling told him that defendant is dangerous was offered to explain Anderson's behavior in initially lying to the police, not to show that defendant is dangerous.[4] Anderson's testimony was therefore properly before the jury and this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER FOUR
The portrayal of Shannon Zeno as dangerous, and affiliated with terrorists during the trial and closing arguments, when viewed against the backdrop of the inordinate security measures taken during the trial, including having the appellant remain in shackles, and locking the courtroom doors, deprived him of a fair trial.

ASSIGNMENT OF ERROR NUMBER FIVE
The remarks of the prosecutors during closing argument, directed toward portraying the appellant as a terrorist, characterizing him as an animal, and alluding to a previous criminal history were outside the scope of the evidence introduced at trial and were so prejudicial as to warrant a mistrial and a reversal of the conviction.

DISCUSSION
The record reflects that additional security measures were implemented in the courtroom after a pre-trial hearing in which the state indicated its intent to introduce evidence that defendant was affiliated with a "Black militant group" and that this affiliation was a motivation for the crime.[5] Prior to jury selection, the trial court ordered defendant's handcuffs removed while in the courtroom, but his leg shackles would remain. The trial court advised defendant to keep his legs under the table, out of the jury's view.
Defendant does not complain that the increased security measures implemented by the trial court were unreasonable. Rather, he argues that the combination of the increased security and "[i]mpermissible questioning and [closing] argument concerning [defendant's] dangerousness pervaded this trial, clearly impacting the jury's verdict."[6]
La.C.Cr.P. art. 774 provides that closing argument must not appeal to prejudice. However, prosecutors have considerable latitude in making closing argument, and even when a prosecutor has exceeded that latitude, a conviction will not be reversed unless the reviewing court is "firmly convinced that the jury was influenced *709 by the remarks and that they contributed to the verdict." State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, 375, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996).
Defendant contends that the prosecutor appealed to prejudice and fear, in violation of La.C.Cr.P. art. 774, with the following closing remarks:
Shannon Zeno is everything bad, everything contrary to our laws, everything contrary to humanity. And that shirt alone recovered from the search warrant at Delaware, that Counter Terrorism Special Operations Division, that is Shannon Zeno.
And it is ludicrous to believe for one minute by anyone that Jermal Anderson is not afraid of that man. It's equally ludicrous to believe that Keith Sterling is not afraid of that man.
* * *
Take it in the back.[7] Look at it yourself. You wanted the opportunity. It's pretty clear, .308, that .308, $500. I wonder what that could be, Mr. Fascination With Guns. I wonder what that vest for $200 is about as well. Of course, there wasn't any testimony that that's a bullet-proof vest or an assault rifle. You be the judge.
And now why would Shannon Zeno need that? Couldn't be because he's running from police. No, not the man who pulled out a buck knife on Sergeant John Fourcade. Not the man who alluded (sic) the police on February 18th, jumped out of the car, ran through the canal. Not the man who hid out. Not the man who was caught in that camouflage with his knife running from police again. No, he wouldn't need a.308 assault rifle and a vest, that can't be what the note means.
* * *
You can't take away what happened to them. And they will never forget it. Ms. Klein and Ms. Scroggin will forever relive this moment. And hopefully in time it will lessen. Hopefully. Probably not.
But we can give them justice and you can give them peace of mind by putting that animal in jail for the rest of his life.
With regards to the prosecutor's comments about the shirt, Lieutenant Toca testified at trial that a shirt bearing the emblem "Counter Terrorism Special Operations" was located at the Sterling residence. The shirt, along with army boots, and a camouflage jacket found at the residence, was admitted into evidence. With regards to the "shopping list," defendant's girlfriend, Anya Sterling, testified that she told police that she had never seen defendant with a gun, but that he was "fascinated" with them. She said her father was also a gun "freak" and defendant and her father frequently talked about guns. She also stated that defendant often paid bills for her family and that some of the items on the note possibly denoted expenditures to be made for her family. She testified, however, that she did not know what the notation ".308" for $500.00 or "vest" for $200.00 meant.
La.C.Cr.P. art. 774 requires the closing argument to be confined to the evidence or lack thereof, the conclusions which may be inferred, and the applicable law. Because the shirt and the "shopping list" were admitted into evidence, the prosecutor's comments about them was permissible argument based on the evidence and the conclusions which may be inferred.
Defendant also complains about the prosecutor's reference to defendant pulling a knife on Sergeant Fourcade just prior to *710 being apprehended. At trial, Sergeant Fourcade testified that he assisted in defendant's arrest, and that defendant fled from the police. During the foot chase, defendant removed a buck knife from his pocket and refused to discard the knife until ordered to do so by Sergeant Fourcade at gunpoint. Therefore, the prosecutor's remarks were a permissible comment on the evidence.
Clearly the prosecutor's remark that defendant is an "animal" who should be put "in jail for the rest of his life" was beyond the evidence, was improper, and should not have been made. We do not condone the use of such language in closing arguments, and find that it is not only improper, it is unnecessary. However, we find that the remark was not so prejudicial as to warrant reversal. See State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, 200, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995); State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996).
Defendant also claims that another prosecutor improperly referred to other crimes in closing argument on rebuttal and improperly asserted his personal opinion. The comments challenged by defendant are in the following portion of rebuttal:
I don't think there's any doubt that an armed robbery occurred. None at all. There's no doubt that there was a conspiracy; that these people got together, drew this thing up, and, as I told you, this was a professional job. Armed robbers don't take these kind of measures to avoid detection.
I've been in this business a long time. And this may be the worst armed robbery I've ever seen. Because Mr. Zeno, you see, is a user. Some people are givers and some are users. And what he did was he used Keith Sterling, Jermal Anderson, and Noel Knight for his own evil purposes.
I can tell you right now that I think that Shannon Zeno is, in the purest form
The defense objected at this point, and the prosecutor stated he would rephrase his remarks. The prosecutor continued:
Can you think of anything other than pure evil to explain what happened to Frances Klein and what happened to Juanita Scroggin? And that pure evil sits right there. It's Shannon Zeno, a professional armed robber.
* * *
This was a horrible thing. Don't let this man back out on the street. He is guilty. The evidence shows it. And you have but one choice, and one choice only: To find this man guilty as charged of conspiracy to commit armed robbery and armed robbery.
La.C.Cr.P. art. 774 provides that the state's rebuttal shall be confined to responding to the defense's argument. In his closing argument, defense counsel urged the jury to consider the lack of physical evidence linking defendant to the crime and to return a not guilty verdict. The prosecutor in rebuttal argued that the lack of physical evidence indicated that the robbery was not a random act, but rather was planned. Taken in context, the prosecutor's statement that defendant was a professional robber was in response to the defense's argument, not a reference to any previous criminal history of defendant.
With regard to the remarks expressing the prosecutor's personal opinion, while the jurisprudence has recognized the broad latitude of prosecutors in closing argument, prosecutors should not resort to personal experience or turn argument into a plebiscite on crime. State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, 716, cert. denied, ___ U.S. ___, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998). However, as stated above, the reviewing court must be firmly convinced that the remarks influenced the jury and contributed to the verdict. *711 After a thorough review, we are not firmly convinced that the jury was influenced by the complained-of remarks, or that they contributed to the verdict.

ASSIGNMENT OF ERROR NUMBER SIX
The trial judge failed to justify the necessity for consecutive sentences. The sentences, when considered together, are excessive.

DISCUSSION
Both the Eighth Amendment to the United States Constitution and Article I § 20 of the Louisiana Constitution prohibit the imposition of excessive or cruel punishment. A sentence is generally considered to be excessive if it is grossly disproportionate to the offense or imposes needless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (La.1992).
Defendant's chief complaint is that the trial judge failed to justify the need for imposing consecutive sentences. Defendant was originally sentenced on the conspiracy conviction to serve the sentence of forty-nine years and six months at hard labor without benefit of parole, probation, or suspension of sentence. For the armed robbery conviction, the trial judge sentenced defendant to serve ninety-nine years at hard labor without benefit of parole, probation or suspension of sentence, and further ordered the sentences to run consecutively with each other and with any other sentence defendant may be serving. Defendant's sentences were the maximum allowable by law. See La. R.S. 14:64(B) and La. R.S. 14:26(C).
After defendant was found to be a third felony offender, he received a sentence of life imprisonment without benefit of parole, probation, or suspension of sentence. Because the underlying felony, armed robbery, as well as one of the predicate felonies was a crime of violence, the enhanced sentence was mandatory. See La. R.S. 15:529.1(A)(1)(b)(ii); La. R.S. 14:2(13)(w); La. R.S. 14:64. The judge then ordered the enhanced sentence to run consecutively with the conspiracy sentence.
Defendant does not contend that either sentence on it own is excessive. Rather, defendant urges that the sentences together are excessive because the trial judge failed to justify the need for consecutive sentences. La.C.Cr.P. art. 883 governs the imposition of consecutive and concurrent sentences, and provides in pertinent part:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.
Since the instant offenses were part of the same transaction, there was a presumption in favor of concurrent sentences. Although the imposition of consecutive sentences requires particular justification when the crimes arise from a single course of conduct, consecutive sentences are not necessarily excessive. Such sentences are justified when the offender poses an unusual risk to public safety. State v. Johnson, 97-867 (La.App. 5 Cir.4/15/98), 711 So.2d 848, writ denied, 98-1293 (La.10/9/98), 726 So.2d 20; State v. Jackson, 96-661 (La.App. 5 Cir.4/9/97), 694 So.2d 440, writs denied, 97-1050 (La.10/13/97), 703 So.2d 609 and 97-1255 (La.10/13/97), 703 So.2d 612.
Although the trial judge in the instant case did not specifically state her reasons for imposing consecutive sentences at either original sentencing or the enhanced sentencing, the trial judge's reasons at original sentencing indicate that she considered *712 the violent nature of the crime when imposing consecutive, maximum sentences. At the original sentencing, the trial judge gave the following reasons:
All right. Mr. Zeno, on July 22nd, 1998, the jury found you guilty as charged of conspiracy to commit armed robbery and armed robbery. After considering the calculated coldness in which this crime was committed and the heinous nature of the crime, which included knocking the victim, Ms. Klein's teeth out with the butt of a sawed-off rifle, together with the fact that you knowingly created a risk of death or great bodily harm to more than one person, and, further, after considering your previous criminal history, including three armed robbery convictions, as well as your apparent affiliation with a militant group, as evidence by the weapon of terrorist seized ...
The trial judge then imposed the maximum sentences on both counts.
In the instant case, the record supports the consecutive sentences imposed by the trial judge. Both Ms. Klein and Ms. Scroggin testified that they were terrified during the robbery and both of them suffered physical injury, although Ms. Klein's injuries were much more severe. Her teeth had been knocked out, her nose was fractured, and she had a fracture in her mouth. Ms. Klein testified that the doctors were waiting to see if her mouth would heal properly so that they could try to save her lower teeth. Ms. Scroggin had a laceration on her face, and became so upset by merely recounting the events of that night, that the court had to take a recess for her to regain her composure. Additionally, the record reflects that this armed robbery was planned. Defendant knew how many people would likely be there, where the money was kept, and he came prepared with a sawed-off rifle, and dressed in a manner to avoid detection.
Once imposed, a sentence will not be set aside absent a showing of manifest abuse of the trial court's wide discretion to sentence within statutory limits. State v. McCorkle, 97-966 (La.App. 5 Cir.2/25/98), 708 So.2d 1212, 1219. Generally, maximum sentences are reserved for cases involving the most serious violations of the offense charged, and the worst type of offender. Id. at 1218. Based on the foregoing, we do not find that defendant's sentences constitute an abuse of the trial court's wide discretion.
Finally, pursuant to La.C.Cr.P. art. 920, the record was reviewed for errors patent, and one is noted. The record reflects that defendant was inadequately advised of the provisions of La.C.Cr.P. art. 930.8. The article requires a trial judge to inform defendant at sentencing that he has three years after his judgment of conviction and sentence becomes final within which to apply for post conviction relief. The trial judge in this case merely informed defendant that he had three years to seek post conviction relief. Accordingly, the trial court is hereby ordered to send written notice of the prescriptive period in La.C.Cr.P. art. 930.8 to defendant within ten days of the rendering of this Court's opinion, then file written proof in the record that defendant received such notice. See State v. Kershaw, 94-141 (La. App. 5 Cir.9/14/94), 643 So.2d 1289.
For the foregoing reasons, defendant's conviction and sentence are hereby affirmed, and the matter is remanded to the trial court with instructions to properly advise defendant of the prescriptive period in La.C.Cr.P. art. 930.8.
AFFIRMED; REMANDED.
NOTES
[1] Prior to defendant's trial, Jermal Anderson and Keith Sterling pled guilty to conspiracy to commit armed robbery. The State nolle prossed the armed robbery charges against both of them and nolle prossed the conspiracy charge against Noel Knight.
[2] While Ms. Scroggin testified that both perpetrators wore black clothes, black gloves and black ski masks, she noticed that both were African American because she saw their eyelids when they blinked.
[3] The record reflects that at this point in Ms. Scroggin's testimony, she became so upset that a recess was taken so that she could regain her composure.
[4] Moreover, even if we found Anderson's testimony inadmissible, it is merely cumulative or corroborative of other testimony adduced at trial, and is considered harmless. State v. Winfrey, 97-427 (La.App. 5 Cir.10/28/97), 703 So.2d 63, 78, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481.
[5] However, no such evidence was actually introduced at trial.
[6] In these two assignments, which are also combined in defendant's appellate brief, defendant reargues the questioning of Jermal Anderson with regards to Keith Sterling's representations to him of defendant's dangerousness. As this argument has already been addressed, it will not be revisited.
[7] In this excerpt, the prosecutor is referring to the handwritten "shopping list" which was seized, along with $1,945.00 in cash, from the vehicle defendant abandoned when the police initially tried to apprehend him. No one testified at trial regarding what the items ".308" and "vest" meant.