|9CLARENCE E. McMANUS, Judge.
Defendant, Casey Reichard, was convicted of theft of money valued at over $500.00, a violation of LSA-R.S. 14:67. Defendant’s motions for new trial and for post-verdict judgment of acquittal were denied. Thereafter, defendant stipulated that he was a second felony offender. The trial judge sentenced defendant to five years of imprisonment at hard labor and to pay a $1000.00 fine. This timely appeal follows.
On July 9, 2001, at approximately 7:53 a.m., Monica Normand, a bartender at Rusty’s Pool Tavern in Laplace, reported an armed robbery at Rusty’s. Detective Colas of the St. John the Baptist Sheriffs Office responded to the scene. Detective Colas testified that Normand related that, when she exited the restroom, she observed an individual dressed in black near the front door and another individual dressed in black near the pool table. Normand said that the individuals approached her, walked her to the cash register and the money was removed. She said that the individuals ordered her into the office, which was behind the bar. The Isindividuals attempted to remove the video tape from the recorder. When they could not remove the tape, they removed the recorder from the wall. Additionally, the individuals removed a safe from the office by rolling it, along with the VCR, out of the establishment on top of a chair. One of the individuals accompanied her into the storage room where money was kept in another safe. She opened the safe and the individual removed the money pouch from that safe. After loading the goods into a yellow car, they headed west toward Baton Rouge. However, when Gregory Miller, the owner of Rusty’s Pool Tavern, arrived Normand became nervous, started crying, and said that she was sick. Mr. Miller estimated that the safe contained approximately $12,000.00 or $13,000.00. Of that amount, there was approximately $1,000.00 in checks. Approximately $250.00 to $300.00 was also taken from a small freestanding safe. All of the money had been removed from the cash register, which contained approximately $1,000.00.
Detective Colas and Normand went to the Detective Bureau to continue the interview. At that point, Normand was not considered to be a suspect. While at the Detective Bureau, Normand gave a recorded statement to Detective Colas that was consistent with what she had initially said at the scene. At the conclusion of the taped statement, Normand began crying again, said that she felt sick, and that she would continue the interview when she felt better.
On July 11, 2001, Normand returned to give another recorded statement to Detective Colas. While Detective Colas was questioning her, Normand began crying *100 and said that she wanted to tell the truth. She told Detective Colas that she had been involved in the robbery along with defendant and another person. After Normand was advised of and waived her constitutional rights, she gave another recorded statement.
UAfter the statement was concluded, Normand began writing in the back of her address book. Detective Colas saw that she was writing a note to defendant as follows:
CASEY,
I love you with all my heart I’m Sorry. But I didn’t want you to go back to jail or Gerry and I didn’t want to go to jail. I’m Sorry. I tried real hard. I held everything I could But I couldn’t do it anymore. I want us to have a life together I hope you & Gerry can forgive me I hope you still love me and want to be w/me.
Detective Colas further testified that defendant came to the Detective Bureau that day and was arrested.
Detective Colas obtained a search warrant for 8777 Sunny Side Drive, Gerald Freeland’s house, and executed the warrant while Normand was there. She pointed out various items that Detective Colas seized. In particular, Normand pointed out a cardboard box containing over $4,000.00 seized from the computer room. According to Normand, she and defendant stored their share of the money in the cardboard box. Detective Colas also seized a leather traveling bag containing Gerald Freeman’s share of the money, which was over $4,000.00. Normand also pointed out items that were purchased with the stolen money, including a freezer, a new front door, clothing, toys and jewelry.
Gerald Freeland was arrested and cooperated with the investigation. He directed Detective Colas to an area near a river in St. Charles Parish where clothing and other items were disposed. The next day, July 12, 2001, Detective Colas returned to that location and recovered several items, including black hooded jackets, gloves, bandanas, a .380 caliber pistol, pants, a check endorsed by Rusty’s Pool Tavern, and 'a set of keys from Rusty’s Pool Tavern. Although Detective Colas searched for the safe, the VCR, and the tape in the river, he was unable to find them.
IsGerald Freeland testified at trial that he had pled guilty to theft over $500.00 and received five years of imprisonment in the Department of Corrections. Freeland testified that defendant and Monica Normand were living with him and his children at the time of this incident. Freeland testified that Monica Normand said that there was a safe containing a lot of money at Rusty’s. According to Freeland, the plan was for Monica Normand to telephone Freeland and defendant to let them know when no one else was in the bar. On the morning of July 9, 2001, Normand called defendant and Freeland. She said it was safe to come over because there was no one in the bar. He and, defendant were dressed in black and had their faces and hands covered. Freeland was armed with a .380 caliber gun and there was a BB or pellet gun in the car. After entering the bar, Freeland locked the door. Freeland said they went to the back, retrieved the safe and took the money out of the register. According to Freeland, defendant was the one who removed the money from the register and the other safe.
After loading the goods, including the VCR into Freeland’s car, they drove to St. Charles Parish near the river where Free-land forcibly opened the safe and removed the money. Freeland said that he disposed of the safe and the VCR in the river. *101 Freeland estimated that they took $14,000.00, which was split in half.
When asked on cross-examination whether he had made a statement contrary to his testimony, Freeland answered negatively. However, Freeland admitted that, while he was in jail, he wrote a document that stated the defendant did not participate or have knowledge of the theft from Rusty’s. Freeland stated that his testimony was the truth and that he did not sign the document because it did not contain the truth. Further, Freeland stated that he never intended anyone to see the document and could not explain how defense counsel had obtained it.
On September 19, 2001, Monica Normand pled guilty to theft valued at over $500.00 arising out of the incident at Rusty’s. After her plea, Normand gave a 1 ¿recorded statement to Detective Hymel, in which she reiterated the details of her involvement in the staged robbery at Rusty’s, as well the participation by defendant and Freeland. Further, Normand acknowledged that, as part of her plea agreement, she agreed to testify against Freeland and defendant at their trials.
At trial, Normand testified that she had pled guilty and received a probated sentence of four years. Normand testified that she and defendant, who was her boyfriend at the time, were living with Free-land in July 2001. However, when asked whether she, defendant and Freeland had discussed a plan to take money from Rusty’s, Normand stated she did not remember. Normand testified that one of the people in the staged robbery was Freeman, and she indicated that she knew the identity of the other person. When the prosecutor asked who that person was, Norman replied, “I just, I can’t.” In response to the prosecutor’s question whether defendant was that person, Normand said, “I’m sorry, I just, I, I can’t.” When the prosecutor asked whether he would be wrong if he said that the other person was defendant, Norman replied, “I can’t say yes or no on that.” When confronted with the waiver of rights form that she had initialed and signed, Normand acknowledged that she had agreed to testify. However, Normand said that the portion of the waiver of rights form stating that she would testify truthfully was not on the waiver of rights form when she saw it.
Normand acknowledged the contents of her statement to Detective Colas in which she implicated defendant and Freeland in the staged robbery. She also identified the bandanna that defendant wore over his face. She also acknowledged that Free-land ripped the VCR from the wall and rolled the safe to the front door while she and defendant went into the storeroom. Normand acknowledged that she opened the cash box and defendant removed the bag containing money. She acknowledged that Freeland received one-half of the money while she and defendant received the other half. Regarding the note that she wrote in her address 17book, Normand agreed that it was an apology to Freeland and defendant for her inability to continue to lie about the staged robbery. She also stated that she still loved defendant.
On cross-examination, Normand stated that she believed Tony Trapani was the other robber because of what she had heard when Freeland was talking to Tra-pani on the telephone. Normand said she only implicated defendant because the police kept insisting that defendant was the robber, since he had a prior record. Normand stated that she had testified at defendant’s bond hearing that she had lied to the police. Normand said that the note from the address book was an apology to defendant for implicating him, rather than an assertion that he had actually been involved. On redirect examination, Nor *102 mand said that she did not intend to implicate defendant in her testimony on direct examination. Rather, she said that she was merely admitting the contents of her statements to the police.
Tony Trapani testified that he was not involved in the incident at Rusty’s. Trapa-ni said that he and Freeland were former co-employees, but that he had never discussed or joked about robbing Rusty’s with Freeland. Further, Trapani admitted that he was divorced at the time of trial and had been violent with his former wife on occasion.
Detective St. Martin also testified on behalf of the State. According to the detective, he was listening to the radio on September 5, 2002 when he heard a conversation between the radio host and a caller identified as “Casey” (defendant’s first name) from the St. John the Baptist Parish Jail. Detective St. Martin obtained a recording of the telephone call from the jail. The tape was admitted into evidence and was played for the jury. On the tape, the caller stated that he was in jail for theft over $500.00, that it was an “inside job,” and involved his ex-girlfriend.
|sTony Trapani’s ex-wife, Blanca Trapa-ni, was the sole witness for the defense. She testified that Freeland and Trapani showed up at her apartment while she and Trapani were separated. According to Blanca Trapani, Freeland and Trapani were talking about the theft at Rusty’s. However, she could not hear the contents of the conversation, and she only heard Gerald’s voice. Further, she was not certain whether the conversation took place before or after the incident at Rusty’s. Rather, she recalled that Freeland and Trapani were celebrating, and Freeland mentioned he was going on vacation for awhile. Blanca Trapani acknowledged that there were bad feelings between her and her ex-husband, but denied that she had any knowledge that Trapani was involved in the theft.
By his sole assignment, defendant contends that the trial judge should have granted a new trial because the evidence was legally insufficient to support his conviction. Specifically, defendant contends that Normand recanted her prior statements implicating him and that the jury should not have believed Freeland’s testimony.
In reviewing the sufficiency of the evidence, the appellate court must determine whether the evidence, viewed in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 provides that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypotheses of innocence.” Under this statute, the fact-finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence when analyzing circumstantial evidence. See, State v. Marcantel, 00-1629 (La.4/3/02), 815 So.2d 50, 55-56. The Jackson standard of review is an ^objective standard for testing all the evidence, both direct and circumstantial, for reasonable doubt. Id.
In the present case, defendant was convicted of theft of money valued at more than $500.00, a violation of LSA-R.S. 14:67, which provides in pertinent part:
A. Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations.
*103 An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
Encompassed in proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. When the key issue in the case is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Zeno, 99-69 (La.App. 5 Cir. 8/31/99), 742 So.2d 699, 706, writ denied, 00-0105 (La.6/30/00), 765 So.2d 1065.
Although defendant contends that no rational trier of fact could have found him guilty beyond a reasonable doubt, the record contains sufficient evidence to support his conviction. In particular, Detective Colas testified that Monica Normand pointed out the box where she and defendant stored their share of the money. Further, the jury could have found that Monica Normand was telling the truth on direct examination when she said that defendant was one of the perpetrators of the staged robbery at Rusty’s and when she identified State’s Exhibit 13 as the bandanna defendant wore during the incident. Moreover, Gerald Freeland consistently testified that defendant was the other perpetrator. Further, Freeland denied that Trapani had anything to do with the staged robbery.
It is the role of the fact-finder to weigh the respective credibilities of the witnesses, and a reviewing court will not second-guess the credibility | ^determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State v. Wallace, 00-1745 (La.App. 5 Cir. 5/16/01), 788 So.2d 578, 584, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297. Considering the evidence adduced at trial, a rational trier of fact could have found defendant guilty as charged. Accordingly, we find no merit to defendant’s allegation of error.
We have reviewed the record for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990), and find the following errors.
Our review reveals that the defendant was not advised of his multiple offender rights before defense counsel stipulated that defendant was a second felony offender as alleged in the multiple offender bill, as required by La. R.S. 15:529.1(D)(1)(a). La. R.S. 15:529.1 provides that the trial court shall inform the defendant of the allegations contained in the information and of his right to be tried as to the truth thereof according to law, and shall require the offender to say whether the allegations are true. La. R.S. 15:529.1 implicitly requires that the trial court advise the defendant of his right to remain silent. State v. Johnson, 432 So.2d 815, 817 (La.1983).
Generally, the failure of the trial court to advise the defendant of his right to a hearing and his right to remain silent is not considered reversible error where the defendant’s habitual offender status is established by competent evidence offered by the State at a hearing rather than by admission of the defendant. State v. Bell, 03-217 (La.App. 5 Cir. 5/28/03), 848 So.2d 87, 90. However, when the defendant’s status as a multiple offender is established by his own stipulation or admission to the habitual offender bill of information without having been informed of his right to a hearing or his right to remain silent, by either the trial In court or his attorney, there is reversible error. Id.; State v. Staggers, 03-655 (La.App. 5 Cir. 10/28/03), 860 So.2d 174, 179.
Accordingly, we vacate defendant’s multiple offender adjudication and sentence *104 because the record does not reflect defendant was advised of his multiple offender rights prior to his attorney stipulating to the multiple offender bill of information. See, Staggers, supra.
Further, we note that the defendant’s enhanced sentence is illegal because the trial judge imposed a $1000.00 fine. Although the underlying offense of theft valued at $500.00 or more may be punishable by a fine of not more than $3,000.00, the Louisiana Supreme Court has held that the habitual offender statute does not permit a fine to be imposed as part of an enhanced sentence. State v. Dickerson, 584 So.2d 1140 (La.1991) (per curiam). However, because we vacate the defendant’s sentence, discussed supra, this error is moot.
For the above discussed reasons, we affirm defendant’s conviction for theft. We vacate defendant’s adjudication as a second felony offender and the enhanced sentence imposed pursuant to the multiple offender proceedings. The matter is remanded for further proceedings.

CONVICTION AFFIRMED, MULTIPLE OFFENDER SENTENCE VACATED, REMANDED FOR FURTHER PROCEEDINGS