SUSAN M. CHEHARDY, Chief Judge.
12Pefendant was convicted of four counts of second degree murder, one count of attempted second degree murder, one count of armed robbery, one count of illegal use of weapons, and one count of conspiracy to commit armed robbery. The trial court sentenced defendant to four consecutive sentences of life imprisonment at hard labor on the four murder counts, 50 years at hard labor on the attempted murder count, 99 years at hard labor on the armed robbery count, 2 years at hard labor on the illegal use of weapons count, and 49 years at hard labor on the conspiracy to commit armed robbery count. Defendant now appeals his convictions and sentences. For the following reasons, we affirm defendant’s convictions on all counts and his sentences for attempted second degree murder, armed robbery, illegal use of weapons, and conspiracy to commit armed robbery. We vacate in part his four life sentences and remand for resen-tencing with instructions.

Procedural History

On June 16, 2011, a Jefferson Parish Grand Jury issued an eight-count ^indictment charging defendant, Dominique Davis, with four counts of second degree murder in violation of LSA-R.S. 14:30.1 (counts one, four, five, and six), one count of armed robbery in violation of LSA-R.S. 14:64 (count two), one count of illegal use of weapons in violation of LSA-R.S. 14:94 (count three), one count of attempted second degree murder in violation of LSA-R.S. 14:27:30.1 (count seven), and one count of conspiracy to commit armed robbery in violation of LSA-R.S. 14:26:64 (count eight).[1] Defendant entered pleas of *71 not guilty to all charges and proceeded to trial by jury.
On November 18, 2011, after a four-day trial, the twelve-person jury found defendant guilty as charged on all eight counts. On December 5, 2011, the trial court denied defendant’s motion for a new trial. Thereafter, defendant waived sentencing delays and on his four convictions of second degree murder, the trial court sentenced defendant to four consecutive sentences of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On his armed robbery conviction, defendant was sentenced to 99 years at hard labor without benefit of parole, probation, or suspension of sentence. On his illegal use of weapons conviction, defendant was sentenced to 2 years at hard labor. On his attempted second degree murder conviction, defendant was sentenced to 50 years at hard labor. And on his conspiracy to commit armed robbery conviction, defendant was sentenced to 49 years at hard labor. These sentences were ordered to be served concurrently with one another. Defendant filed a written motion for appeal, which was granted on December 7, 2011.

\ ¿Facts

Around 6:20 p.m. on January 15, 2009, Julio Miramontes, Alphonso Vincent, and Luis George were standing in Mr. George’s driveway at 1513 Kings Road in Harvey, Louisiana. As the three men stood there, a truck proceeded down the street, appearing to stop in front of them for a moment, but continued on before suddenly reversing back down the street and stopping in front of the driveway. Two men exited the vehicle armed with pistols. One approached Mr. Miramontes, told him that “it was a stick-up and not to move,” put the pistol to his head, and grabbed his wallet, which contained six hundred dollars. Then, before returning back to the truck, the gunman shot Mr. Miramontes and Mr. George. Meanwhile, the other gunman took a work permit from Mr. Vincent and retreated back to the vehicle. After the gunmen left, Mr. Vincent called the police and upon their arrival Mr. Miramontes relayed the events of the shooting to the officers before being transported to the hospital. Mr. Mira-montes was unable to identify the gunman who robbed Mr. Vincent because his head and face were covered, but he was able to get a good look at the gunman who shot him and Mr. George.
Detective Brett Beevers of the Jefferson Parish Sheriffs Office responded to this incident. Upon his arrival at the scene, Detective Beevers observed three .45 caliber casings, some loose change, and blood at various locations in the driveway. Mr. George and Mr. Miramontes had been transported to the hospital and Mr. Vincent, who had not been wounded, was brought to the detective bureau for questioning. No suspects were developed from Mr. Vincent’s interview, and the case was later transferred to the homicide division after Mr. George died as a result of his injuries.
Nearly four months later, on the evening of April 11, 2009, Deputy Judd Harris of the Jefferson Parish Sheriffs Office responded to a report of an illegal | ^discharge of a firearm at 1645 Alexander Court in Terrytown. Deputy Harris found twenty-nine spent casings at the scene, but was unable to develop any suspects at the time. The casings were subsequently identified as having been discharged from two 9 mm weapons, a .45 caliber weapon, and a .40 caliber weapon.
Later that same evening, at 945 East Monterey Court in Terrytown, ten-year- *72 old M.O.[2] was asleep in her bedroom with her twelve-year-old sister K.O., and K.O.’s friend A.M., when she was awakened by a loud “boom” coming from inside the apartment. A black man then came into the room where the three girls slept, turned on the light, told them to “get up,” and put a gun to the back of M.O.’s neck. The man, whose face was covered, pushed M.O. into the next bedroom where her six-year-old brother, F.O., was asleep with the nineteen-year-old babysitter, D.S., and D.S.’s 28-month-old son, R.C. M.O. awakened D.S. D.S., who apparently was not yet aware of the intruder’s presence, took M.O. back to her bedroom and then walked back down the hallway. A.M., who had remained in the bedroom with K.O., then observed two men enter the living room with D.S.
At about this moment, M.O., now back in her room, heard someone running and gunshots outside of her room. A.M. also heard D.S. screaming right before she heard gunshots in the living room. Once this gunfire ceased, a man appeared in the doorway of the girls’ room. K.O. testified that she observed two men standing in the doorway, one behind the other. The man closest to her was dressed in black and armed with a black gun, but K.O. was unable to see his face. This gunman then opened fire. A.M. was shot twice, once in the stomach and once in the arm.
| fiAs soon as this gunfire stopped, K.O. crawled to her brother’s bedroom where she found F.O. and R.C. lying in pools of their own blood. K.O. also observed D.S. lying dead in the hallway. K.O., M.O., and A.M. each testified that they witnessed two intruders in the house that night.
Deputy Harris, who had reported to the scene of the illegal discharge earlier in the evening, was dispatched to 945 East Mon-terey Court. Upon his arrival at the scene, the deputy encountered M.O. and K.O. who both appeared to be in shock. K.O. told the police that she believed a man named Dayshawn Young, who lived in the neighborhood and bought drugs from her step-father, might have been involved in the shooting based on the height of the gunman she observed standing in her doorway, although she never saw his face. Pursuant to this information, Young was arrested. However, after further investigation, including the execution of multiple search warrants and multiple interviews, Young was released because police were unable to recover any evidence linking him to the crimes.
The ballistics evidence found on the scene included 9 mm spent casings located throughout the apartment, as well as three .40 caliber spent casings located in the living room. D.S. was struck by three .40 caliber rounds and one 9 mm round, while R.C. and F.O. were each struck by one 9 mm round. A.M. was struck by two 9 mm rounds.
Dr. Karen Ross, an expert in the field of forensic pathology, performed the autopsies on D.S., F.O., and R.C. Dr. Ross determined that D.S. sustained four gunshot wounds, F.O. sustained a single gunshot wound to the head, and R.C. sustained a single gunshot wound to his head that then re-entered his body through his arm. The gunshot wounds were determined to be the cause of the victims’ deaths and the manner of the deaths was homicide. Dr. Ross opined, based on the lack of gunshot residue on the victims’ bodies, that the shooter was more than three [7feet away from the victims.
*73 On April 13, 2009, two days after the triple homicide on Monterey Court, Mr. Leonel Rodriguez was murdered on Ruby Street in Terrytown. Six .45 caliber casings and five projectiles were recovered from the scene. Then, during the night of April 13-14, 2009, Deputy Scott Henning of the Jefferson Parish Sheriffs Office received a report of an armed robbery and carjacking at 1117 Whitney Avenue in Ter-rytown. The deputy soon located a vehicle fitting the description in the parking lot of an apartment complex at 1536 Stumpf Boulevard in Gretna. The deputy apprehended two individuals in the vehicle, Michael Harris and Dontanya Wilson. The victim of the armed robbery and carjacking, Mr. Lloyd Harris, was then transported to the scene where he positively identified Harris and Wilson as his assailants.
It was determined that Wilson’s girlfriend, LaPrecious Davis, resided in an apartment at 1536 Stumpf Boulevard. She consented to a search of her apartment where police found a black .45 caliber Hi-Point semi-automatic handgun.
After his arrest, Wilson was interviewed and gave a statement admitting to his participation in the armed robbery of Lloyd Harris and the murder of Leonel Rodriguez. With respect to the murder of Leonel Rodriguez, Wilson stated that he and DeJean Turner were at a convenience store when Turner suggested that they rob “two Mexicans” that he saw in the store with “a lot of money on them.” Wilson agreed to the plan. Wilson said he and his friends regularly committed armed robberies of Hispanic men because they are easy targets due to their immigration status and abundance of cash. Wilson and Turner followed the men to Ruby Street, jumped out of the car, and shot Rodriguez multiple times with a .45 Hi-Point when he refused to give them his money. The following night, he and Harris used the same .45 Hi-Point to rob Lloyd Harris and steal his car.
IsAfter Wilson admitted to these crimes, the police inquired about the .45 Hi-Point used to commit them, which they suspected was connected to other murders that were under investigation. Wilson informed the police that the gun had been used by defendant in the January 2009 Kings Road robbery-homicide.[3] Wilson said he learned of the Kings Road murder from defendant who told him to “be careful with the gun [because] it had a couple of bodies on it.” Defendant then relayed the details of the murder to Wilson.
According to Wilson, defendant told him that he and DeJean Turner walked up to two Mexicans and demanded their money. When the men refused to turn it over, they shot both of them and one of them lived. Wilson said that defendant had given him the .45 Hi-Point because it was their practice to swap out guns between his “group” which consisted of defendant, Turner, Clarence Windbush, and three other men with nicknames “Red,” “New,” and “Wayne.” Wilson stated that his group would use the .45 Hi-Point and other weapons interchangeably to commit armed robberies in Jefferson Parish.
Pursuant to Wilson’s confession, Detective Donald Clogher of the Jefferson Parish Sheriffs Office presented a photographic line-up to Mr. Miramontes who identified defendant as the man who shot him and killed Mr. George on January 15, 2009.
Wilson was ultimately indicted with the second degree murder of Leonel Rodri *74 guez and the armed robbery of Lloyd Harris. He entered into a plea agreement whereby in exchange for pleas of guilty and testimony in this case, the State agreed to reduce his second degree murder charge to manslaughter with a sentence of 40 years to run concurrent with a 20-year sentence on the armed robbery charge.
|<)At defendant’s trial, Wilson testified about his involvement in the illegal discharge on Alexander Court and the triple homicide on Monterey Court on April 11, 2009. He stated that approximately three hours prior to the triple homicide, he and his “group,” which included defendant, fired the .45 Hi-Point and other guns in a populated area at 1645 Alexander Court “for no reason.” After firing the guns, defendant, Wilson, Turner, and Wayne planned on committing an armed robbery of a drug dealer known as “B.” Wilson testified that they had thought about robbing “B” before, but decided to wait until he moved out of the neighborhood where defendant lived because it was “too close to home.” They had learned of “B’s” new address from his step-daughter, K.O.
Indeed, K.O. testified that she recalled standing outside of her apartment on Mon-terey Court one day when defendant pulled up in a truck with someone named “Tiny Man.” Defendant asked her where she was living and K.O. pointed out their apartment to him.
On the night of April 11, 2009, defendant, Wilson, Turner, and Wayne executed their plan to rob “B” by taking two cars— a Durango and an Armada — over to “B’s” apartment. Once they arrived, Wilson stayed in the Armada as the look-out while defendant, Turner, and Wayne went inside. Defendant was armed with a 9 mm handgun, Wilson with the .45 Hi-Point, Wayne with a .40 caliber handgun, and Turner with an SKS assault rifle. Approximately two to three minutes after the men entered the apartment, Wilson heard several gunshots. The three men then exited the apartment; Wayne drove off in the Durango, while defendant and Turner drove away in the Armada with Wilson. While in the car, defendant explained to Wilson that after searching the house, D.S. recognized defendant and told him that she was going to “tell B,” so defendant fired his gun at her. Wilson later learned from a news report that children had also been killed in |10the apartment. When Wilson confronted defendant about this, defendant replied that he did not know he had killed children.
During the investigation at Monterey Court, Chad Pitfield, an expert in the field of latent fingerprint examination, checked every possible surface at the crime scene for fingerprints and obtained five readable prints. Pitfield concluded that four of the prints belonged to R.O., while the fifth print found on the door knob leading into the first bedroom where A.M. was shot, belonged to defendant.
After obtaining this fingerprint evidence, M.O. and K.O. were interviewed again in which they stated that defendant had never been permitted inside their Monterey Court apartment. Indeed, their mother, R.O., testified that she had moved into the apartment with her three children approximately two or three weeks prior to the murders. Also living there at the time were R.O.’s boyfriend, Byron Estes, as well as R.O.’s friend, D.S. and her son, R.C. R.O. admitted that Estes was a drug dealer who had sold drugs to defendant in the past.
R.O. further testified that she and her children were very familiar with defendant because they lived next door to him at their prior residence, where he was invited into their home from time to time. However, defendant had not been invited into *75 their home at Monterey Court and R.O. had never told defendant where they had moved.
Thereafter, a warrant was prepared for defendant’s arrest in connection with the Monterey Court triple homicide. An arrest warrant had already been issued for defendant’s participation in the Kings Road homicide. Defendant was ultimately located in Atlanta, Georgia, where he was arrested and extradited back to Louisiana.
Upon defendant’s arrival at the detective bureau, Detective Roger Gorumba of the Jefferson Parish Sheriffs Office took two statements from him. With regard |nto the Monterey Court murders, defendant denied ever being inside the Monterey Court apartment. With regard to the Kings Road murder, defendant offered alibis, which detectives were unable to substantiate after further investigation.
Joel O’Lear, an expert in the field of firearm and tool mark analysis, reviewed all of the ballistics evidence recovered from the murder on Kings Road, the illegal discharge on Alexander Court, the triple murder on Monterey Court, and the murder on Ruby Street. O’Lear determined that four guns had been used at these crime scenes: two 9 mm, one .40 caliber, and one .45 caliber. Specifically, with respect to the Kings Road murder, O’Lear matched three casings to the .45 caliber Hi-Point pistol recovered from the armed robbery of Lloyd Harris. With respect to the Ruby Street murder, six casings and five projectiles matched the same .45 caliber Hi-Point pistol. As to the illegal discharge on Alexander Court, 29 casings were submitted for analysis. Of these, O’Lear found that seven were fired from an unrecovered 9 mm pistol that could not be linked to any of the referenced crimes. However, O’Lear determined that ten of the casings were fired from the .45 Hi-Point pistol used in the Ruby Street and Kings Road murders. Seven of the casings were fired from a second unrecovered 9 mm pistol that discharged the 9mm rounds at Monterey Court, as well as matched two November 2008 shootings. And five of the casings were fired from a .40 caliber weapon which discharged the .40 caliber rounds at Mon-terey Court.
This evidence was further summarized by Colonel Timothy Scanlan, Commander of the Homicide Division of the Jefferson Parish Sheriffs Office and an expert in the fields of firearm and toolmark examination, crime scene reconstruction, and bloodstain pattern analysis. Colonel Scan-lan explained that the ballistics evidence obtained in connection with the Kings Road murder, the Ruby Street murder, the discharge of firearms on Alexander Court, and the armed | ^robbery of Lloyd Harris, linked all of the crimes to the Monterey Court murders. Colonel Scan-lan also noted it is common for criminals who act in concert to share weapons and that defendant’s residence was located in the geographic center of all these crimes.
In addition, Colonel Scanlan offered a reconstruction of the events at Monterey Court. He determined that the evidence was consistent with the presence of two shooters. One shooter, armed with a .40 caliber weapon, discharged rounds in the living room at D.S. The second shooter, armed with a 9 mm weapon, proceeded down the hallway, stopping at the first bedroom where K.O., M.O., and A.M. slept, and fired multiple rounds into that room. This shooter then proceeded to the second bedroom where F.O. and R.C. slept and fired rounds into that bedroom. Before exiting the apartment, the second shooter fired a final round at D.S. in the living room, which is supported by Dr. Ross’s finding that D.S.’s 9 mm wound displayed characteristics consistent with a gap in *76 time between when she sustained her .40 caliber wounds and her 9 mm wound.

Law and Argument

On appeal, defendant raises two assignments of error: first, the trial court erred in failing to sever the counts for trial; and second, the trial court erred in admitting other crimes evidence under a guise of a conspiracy count never proven at trial and which violated the prohibition against double jeopardy.
When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992). If the appellate court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Id. Thus, we will address defendant’s second assignment of error first.
|1flIn his second assignment of error, defendant raises three interrelated arguments. First, he argues that the trial court erred in denying his motion in limine and request for a mistrial, allowing the State to admit evidence of other crimes committed by Dontanya Wilson. Second, he argues that this other crimes evidence was admitted under the guise of a charge for criminal conspiracy, which the evidence offered in support thereof was insufficient to support the conviction. And third, his convictions of armed robbery and conspiracy to commit armed robbery violate the prohibition against double jeopardy. Since the second argument of this assignment relates to the sufficiency of the evidence, we will address it first.
Defendant argues that there was insufficient evidence presented at trial to support his conviction for conspiracy to commit armed robbery on or between January 15, 2009 and April 14, 2009.
In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); State v. Mickel, 09-953, p. 4 (La.App. 5 Cir. 5/11/10), 41 So.3d 532, 584, writ denied, 10-1357 (La.1/7/11), 52 So.3d 885.
Under the Jackson standard, a review of the record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. State v. Jones, 08-20, p. 6 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of 114fact would have found guilt beyond a reasonable doubt. Id., 08-20 at 7, 985 So.2d at 240.
When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Dixon, 07-915, p. 11 (La.App. 5 Cir. 3/11/08), 982 So.2d 146, 153, writ de *77 nied sub nom., State ex rel. Dixon v. State, 08-0987 (La.1/30/09), 999 So.2d 745.
Here, defendant challenges his conviction of conspiracy to commit armed robbery. Armed robbery is defined in LSA-R.S. 14:64 as “the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.”
Criminal conspiracy is defined in LSA-R.S. 14:26(A) as:
[T]he agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.
Thus, the elements of the crime of conspiracy are: (1) an agreement or combination of two or more persons for the specific purpose of committing a crime, plus (2) an act done in furtherance of the object of the agreement or combination. State v. Tatum, 09-1004, p. 11 (La.App. 5 Cir. 5/25/10), 40 So.3d 1082, 1089. Proof of a conspiracy may be made by direct or circumstantial evidence. State v. Zeno, 99-69, p. 7 (La.App. 5 Cir. 8/31/99), 742 So.2d 699, 705, writ denied, 00-105 (La.6/30/00), 765 So.2d 1065.
The first element of a criminal conspiracy requires specific intent, which is defined as the “state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” Zeno, 99-69 at 6, 742 So.2d at 704 (citing LSA-R.S. 14:10(1)). The determination of specific criminal intent is a question of fact and may be inferred from the circumstances and from the actions of the defendant. Id.
The second element of a criminal conspiracy, the overt act, need not be unlawful. State v. Jackson, 00-221 (La.App. 5 Cir. 3/15/01), 783 So.2d 482, 487, writs denied, 01-1071 (La.5/9/03), 843 So.2d 385, and 01-1258 (La.5/9/03), 843 So.2d 386. It may be any act, innocent or illegal, accompanying or following the agreement, which is done in furtherance of its object. Id.
In the instant case, the State’s theory of a criminal conspiracy was based on defendant’s and his inner circle’s regular sharing of weapons for committing various armed robberies in Jefferson Parish:
[State]: ... Was your group making use of [the .45 Hi-Point] and other weapons interchangeably to commit armed robberies in Jefferson Parish?
[Dontanya Wilson]: Yes.
[State]: And did you all intend to use those guns for the purpose of committing armed robberies here in Jefferson Parish?
[Wilson]: For protection too, but any need we felt useful of them.
[State]: Okay. And that — did that include robbing people you thought were likely victims?
[Wilson]: Yes.
* * *
[State]: Does that include in addition to you, Dominique Davis; DeJean Turner; Tip, meaning Clarence Wind-bush; and other people?
11(i[Wilson]: Yes.
Among the group’s targets were Hispanic men whom they considered to be “easy marks,” due to their immigration status and the likelihood that they would have cash on them. Indeed, testimonial and physical evidence established that defen *78 dant used the .45 Hi-Point to rob Julio Miramontes and murder Luis George. This same weapon was then subsequently used by Wilson to rob and murder Leonel Rodriguez. Wilson also testified that in between the time defendant gave him the .45 Hi-Point and the time Wilson killed Rodriguez, he “swapped” the gun out with various people in his group, including defendant. Wilson further testified that the group would talk about the armed robberies they committed:
[State]: Okay. Would Dominique Davis, DeJean Turner, and the other guys you were hanging around with tell you and other people in your group about the crimes they were committing?
[Wilson]: Yes.
[State]: Were you all proud of what you were doing?
[Wilson]: I would say that.
[State]: You were bragging on each other?
[Wilson]: Yes.
With regard to the triple homicide at Monterey Court, the evidence established that this was the result of a plan that had been in the making for some time against “B,” a known drug dealer. “B” had been a target of the group, but they never carried their plan into action due to the proximity of his residence to defendant’s. However, once “B” moved, the group sprang into action. Having learned the location of his new residence, defendant, Wilson, Turner, and Wayne armed themselves and proceeded to “B’s” apartment in two vehicles. Once at the apartment, Wilson stayed outside as the look-out while defendant, Turner, and 117Wayne went inside. When one of the victims recognized defendant, gunfire ensued, and three people were killed.
In finding defendant guilty of conspiracy to commit armed robbery, the jury apparently relied on Wilson’s testimony and the corroborating physical evidence. Bearing in mind that the testimony of one witness, if not contradicted by the physical evidence, is sufficient to support a conviction, we see no reason to disturb the jury’s findings. Dixon, supra. The testimonial and physical evidence established that defendant and his accomplices conspired over a period of time to commit armed robberies of specifically-targeted victims on the West Bank of Jefferson Parish with the use of firearms they regularly exchanged amongst themselves. Acts were committed in furtherance of this conspiracy when the group armed themselves and carried out the armed robberies, leaving several victims dead.
After viewing this evidence in the light most favorable to the prosecution, we find that any rational trier of fact would have found that the State produced sufficient evidence to prove beyond a reasonable doubt that defendant conspired to commit armed robbery. Accordingly, we find no merit in this argument.
Next we address defendant’s argument that the trial court erred in denying his motion in limine and request for a mistrial, allowing the State to admit evidence of other crimes committed by Don-tanya Wilson.
The charged conspiracy to commit armed robbery was alleged to have occurred between January 15, 2009 and April 14, 2009. As proof of the conspiracy, the State enumerated several overt acts committed by defendant and his co-conspirators. Among these overt acts were two crimes committed by co-conspirator Wilson on April 13 and 14, 2009. It was alleged that on April 13, 2009, Wilson, along with DeJean Turner, robbed and murdered Leonel Rodriguez 11swith the .45 Hi-Point firearm. It was also alleged that on April 14, 2009, Wilson and Michael Harris com *79 mitted an armed robbery upon Lloyd Harris with the same .45 Hi-Point.
On the first day of trial, the defense filed a “Motion in Limine to Prevent Introduction of Hearsay Evidence and Motion to Quash Count 8 of Bill of Indictment.” In this motion, defendant argued that Wilson’s statements to the police implicating defendant should be excluded and that the criminal conspiracy charge, count eight, should be quashed because there was an insufficient basis to find a prima facie case of conspiracy. The trial court denied the motion.
Subsequently, at trial, when evidence concerning the April 13-14 crimes committed by Wilson was introduced, the defense objected and requested a mistrial on the grounds that the evidence was “extraneous information” unrelated to him and for which he has never been charged. The trial court denied defendant’s request for a mistrial.
Defendant now argues on appeal that the trial court erred in denying his motion in limine and his request for a mistrial. Defendant contends that the State charged him with the conspiracy count to elicit other crimes evidence through Wilson despite defendant’s lack of involvement, and to tarnish his character in front of the jury. Defendant claims that there was no essential fact at issue with respect to his alleged actions that allowed Wilson to testify about his own crime spree on April 13 and 14, 2009. He contends this evidence only served to unfairly prejudice him.
We will first address the trial court’s ruling on defendant’s request for a mistrial. A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to the defendant that deprives him of a reasonable expectation of a fair trial. State v. Pierce, 11-320, pp. 4-5 (La.App. 5 Cir. 12/29/11), 80 So.3d 1267, 1271. Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion. Id., 11-320 at 5, 80 So.3d at 1271.
Article 770 provides the grounds for a mandatory mistrial. Pierce, supra. LSA-C.Cr.P. art. 770(2) provides that a mistrial shall be granted, upon motion of the defendant, when a remark or comment is made within the hearing of the jury by the judge, district attorney, or a court official during trial or in argument and that remark refers to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.
The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is that such evidence is not admissible to prove that the accused committed the charged crime because he has committed other such crimes in the past. State v. Williams, 09-48, p. 9 (La.App. 5 Cir. 10/27/09), 28 So.3d 357, 363, writ denied, 09-2565 (La.5/7/10), 34 So.3d 860; LSA-C.E. art. 404(B)(1). However, when evidence of other crimes tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to the exclusionary rule. State v. Dauzart, 02-1187, p. 8 (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165. For instance, evidence of other crimes is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding to such an extent that the State could not accurately present its case without reference to the prior bad act. State v. *80 Jones, 09-688, p. 28 (La.App. 5 Cir. 2/9/10), 33 So.3d 306, 326.
In order for other crimes evidence to be admitted under LSA-C.E. art. 404(B)(1), one of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged. State v. Jackson, 93-0424 (La.10/18/93), 625 So.2d 146, 149. Further, the probative value of the extraneous evidence must outweigh its prejudicial effect. LSA-C.E. art. 403.
Evidence of other crimes or bad acts is prejudicial since all evidence which tends to make it more probable than not that an individual committed a criminal offense is necessarily prejudicial. State v. Williams, 02-645, p. 16 (La.App. 5 Cir. 11/26/02), 833 So.2d 497, 507. However, the underlying policy is not to prevent prejudice, since evidence of other crimes is always prejudicial, but to protect against unfair prejudice when the evidence is only marginally relevant to the determination of guilt of the charged crime. Id.
The defendant bears the burden to show that he was unfairly prejudiced by the admission of the other crimes evidence. Dauzart, 02-1187 at 9, 844 So.2d at 165-66. Absent an abuse of discretion, a trial court’s ruling on the admissibility of this evidence will not be disturbed. State v. Merritt, 04-204, p. 11 (La.App. 5 Cir. 6/29/04), 877 So.2d 1079, 1085, writ denied, 04-1849 (La.11/24/04), 888 So.2d 228.
We first note that LSA-C.E. art. 404(B)(1) only prohibits evidence of other crimes or bad acts committed by a defendant. State v. Davis, 08-165, pp. 15-16 (La.App. 5 Cir. 7/29/08), 993 So.2d 295, 304, writ denied, 08-2188 (La.5/1/09), 6 So.3d 810. Here, because the crimes in question were not committed by defendant, but readily admitted to by Wilson, the trial judge did not err in denying defendant’s motion for mistrial.
Moreover, even if this evidence constituted other crimes evidence, neither the State, nor the defense for that matter, could have presented a complete account of the charged offenses to the jury without referring to the crimes committed by Wilson in April of 2009.
|21LSA-C.E. art. 404(B)(1) provides an exception, formerly known as res gestae, for admission of evidence of other crimes “... when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.” Under this exception, res gestae events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the State could not accurately present its case without reference to them. State v. Hyman, 09-409, p. 18 (La.App. 5 Cir. 2/9/10), 33 So.3d 271, 283, writ denied, 10-548 (La.10/1/10), 45 So.3d 1094. The res gestae doctrine is designed to allow the story of the crime to be told in its entirety, by proving its immediate context of happenings in time and place. Id., 09-409 at 18-19, 33 So.3d at 283.
The Louisiana Supreme Court has held that the test of whether res gestae evidence is admissible is not simply whether the State might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive its case of narrative momentum and cohesiveness, with power not only to support conclusions, but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict. State v. Colomb, 98-2813, p. 4 (La.10/1/99), 747 So.2d 1074, 1076.
In the present case, Detective Clogher testified that he was unable to develop any leads in the Kings Road robbery-homicide until Wilson was arrested in connection *81 with the armed robberies and homicide that occurred on April 13-14, 2009. When Wilson was arrested, the .45 Hi-Point weapon was recovered, which ballistics evidence linked to the Kings Road robbery-homicide as well as to the Alexander Court illegal discharge. This, in turn, revealed a link to the Monterey Court triple homicide. Without the evidence regarding Wilson’s April 2009 crimes, the State would have been unable to accurately and completely present its locase. Moreover, the evidence relating to Wilson’s April 18-14, 2009 crimes further helped to prove the conspiracy charge, establishing that defendant and his group shared weapons interchangeably for the purpose of committing armed robberies in Jefferson Parish.
Even assuming arguendo that evidence of Wilson’s crimes constituted inadmissible other crimes evidence, any such error is subject to a harmless error analysis. See State v. Williams, 09-48, p. 12 (La.App. 5 Cir. 10/27/09), 28 So.3d 357, 365, writ denied, 09-2565 (La.5/7/10), 34 So.3d 860. The test for determining if an error was harmless is whether the verdict actually rendered in the case was surely unattributable to the error. Id., 09-48 at 13, 28 So.3d at 365.
In the present case, defendant was identified by Miramontes as the person who robbed and shot him, and who killed Luis George on January 15, 2009. Wilson testified that defendant admitted to the crimes at Kings Road, and testified as to defendant’s role in the Monterey Court triple homicide on April 11, 2009. This testimonial evidence was further corroborated by ballistics and fingerprint evidence. Therefore, even if it was error to admit the challenged evidence of other crimes, the overwhelming evidence of defendant’s guilt rendered such error harmless. Accordingly, we find that the trial court did not abuse its discretion in admitting this evidence nor in denying defendant’s request for a mistrial.
Turning to defendant’s contention that the trial court erred in denying his motion in limine, we find the trial court did not err in denying this motion, which, in essence, sought to exclude the evidence we have found to be admissible. See State v. Johnson, 01-0842, pp. 9-10 (La.App. 5 Cir. 2/13/02), 812 So.2d 106, 114, writ denied sub nom., State ex rel. Johnson v. State, 02-1037 (La.3/21/03), 840 So.2d 532. Accordingly, we find no merit in this argument.
IgjNow, we address defendant’s argument that his convictions of armed robbery and conspiracy to commit armed robbery violate the prohibition against double jeopardy.
At the conclusion of opening statements, the defense moved for a mistrial, arguing that the State violated the principles of double jeopardy by charging defendant with armed robbery and conspiracy to commit armed robbery. The trial court denied defendant’s request for a mistrial, and noted that the conspiracy statute provides that “conviction for one shall not bar prosecution for the other,” thus, a defendant may be “tried for either or both.”
The Fifth Amendment to the United States Constitution, as well as Article 1, § 15 of the Louisiana Constitution of 1974, prohibit placing a person twice in jeopardy of life or limb for the same offense. State v. Garcia, 10-755, p. 5 (La.App. 5 Cir. 5/10/11), 66 So.3d 24, 27. The concept of double jeopardy, under both the federal and state constitutions, embodies the dual purpose of preventing both multiple punishments and multiple convictions' for a single criminal wrong. Id. Thus, every double jeopardy analysis begins with the inquiry into whether a single offense or several offenses are involved. Id.
*82 Louisiana courts utilize two tests in examining violations of double jeopardy. Garcia, 10-755 at 6, 66 So.3d at 27. The “distinct fact” or Blockburger[4] test is applicable where the same act or transaction constitutes a violation of two distinct statutory provisions. Id. In that instance, “the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact that the other does not.” Id.
The other test, the “same evidence test,” is primarily relied upon by Louisiana courts. Garcia, supra. The Louisiana Supreme Court explained the | ^“same evidence test” as follows:
If the evidence required to support a finding of guilt of one crime would also have supported conviction of the other, the two are the same offense under a plea of double jeopardy for only one. The test depends on the evidence necessary for conviction, not all evidence introduced at trial.
Id. (citing State v. Steele, 387 So.2d 1175, 1177 (La.1980)).
The “same evidence test” is slightly broader in concept than Blockburger— the central idea being that one should not be punished twice for the same course of conduct. Garcia, supra. Rather, if the evidence required to support a finding of guilt of one crime would also support a conviction for another offense, the defendant can be placed in jeopardy for only one of the two. State v. Sandifer, 95-2226, p. 5 (La.9/5/96), 679 So.2d 1324, 1329 (Emphasis in original). Put differently, if one offense requires proof of additional facts which the other does not, then the accused may be tried and convicted on both offenses unless the gravamen of the second offense is essentially included within the offense for which first tried, in which ease the second prosecution is barred because of former jeopardy. State v. Solomon, 379 So.2d 1078, 1079 (La.1980).
Under Louisiana law, armed robbery and conspiracy to commit a substantive offense such as armed robbery are separately defined crimes. See LSA-R.S. 14:64 and LSA-R.S. 14:26. To convict a defendant of armed robbery, the State must prove: (1) a taking (2) of anything of value (3) from a person or in the immediate control of another (4) by the use of force or intimidation (5) while armed with a dangerous weapon. LSA-R.S. 14:64. To convict a defendant of conspiracy, the State must prove: (1) an agreement or combination of two or more persons for the specific purpose of committing a crime, plus (2) an act done in furtherance of the object of the agreement or combination. LSA-R.S. 14:26; Tatum, supra.
|g,iFor the following reasons, we find that defendant’s convictions for armed robbery and conspiracy to commit armed robbery do not violate the prohibition against double jeopardy.
First, under the same evidence test, the evidence required to support defendant’s conviction for conspiracy to commit armed robbery does not support his conviction for armed robbery. A conviction for conspiracy requires proof of an agreement and an act done in furtherance of that agreement, while a conviction for armed robbery requires neither. Thus, in the instant case, defendant’s and his co-conspirators’ plan of robbing select individuals and their acts of arming themselves to carry out that plan support defendant’s conviction for conspiracy to commit armed robbery. This evidence, however, does not support defendant’s conviction for armed robbery. That conviction is supported by the execution of *83 the plan, i.e., defendant’s taking Mr. Mira-montes’ wallet at gunpoint.
Second, the United States Supreme Court has explicitly stated that “a substantive crime and a conspiracy to commit that crime are not the ‘same offense’ for double jeopardy purposes.” United States v. Felix, 503 U.S. 378, 389, 112 S.Ct. 1377, 1384, 118 L.Ed.2d 25 (1992); see also Iannelli v. United States, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289-90, 43 L.Ed.2d 616 (1975) (“Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes.”); State v. Knowles, 392 So.2d 651, 654-55 (La.1981) (finding no double jeopardy violation for conspiracy to commit first degree murder and first degree murder because “in order to be convicted as a principal [to a crime], there must be proof that the crime was committed; a conviction for conspiracy does not depend upon the actual commission of the crime, but only upon an act in furtherance of the conspiracy.”).
UfiAnd lastly, LSA-R.S. 14:26(A) expressly provides that conspiracy is a separate and distinct offense for double jeopardy purposes: “If the intended basic crime has been consummated, the conspirators may be tried for either the conspiracy or the completed offense, and a conviction for one does not bar prosecution for the other.”
In view of the foregoing, we find that defendant’s convictions for armed robbery and conspiracy to commit armed robbery do not violate the prohibition against double jeopardy. Defendant was neither convicted nor punished twice for the same course of conduct. Accordingly, we find no merit in this argument and thus, no merit in defendant’s second assignment of error.
Returning to defendant’s first assignment of error, he argues that the trial court erred in denying his motion to sever the January 2009 counts (counts one and two) from the April 2009 counts (counts three, four, five, six, and seven). Prior to trial, defendant filed a motion to sever in which he argued that the joinder of the offenses would result in jury confusion and that the evidence of each count would allow the jury to infer a criminal disposition. The trial court denied the motion. On appeal, defendant contends that the crimes were sufficiently different so as to necessitate separate trials and that the joinder of these offenses allowed the jury to infer a criminal disposition and to harbor hostility toward defendant.
The joinder of offenses is governed by LSA-C.Cr.P. art. 493, which permits offenses to be joined if they are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan, and are triable by the same mode of trial.
Felony offenses not triable by the same mode of trial may still be joined in the same bill of information under the conditions specified in LSA-C.Cr.P. art. 493.2, which provides:
_[2j[0]ffenses in which punishment is necessarily confinement at hard labor may be charged in the same indictment or information with offenses in which the punishment may be confinement at hard labor, provided that the joined offenses are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
In the instant case, with the exception of count three, illegal use of weapons, which is punishable “with or without” hard labor, all of the other charged offenses are punishable by mandatory imprisonment at *84 hard labor. See LSA-R.S. 14:94(B); 14:30.1(B); 14:64(B); 14:27(D)(l)(a); 14:26(C). Thus, pursuant to LSA-C.Cr.P. art. 782(A), count three was required to be tried by a jury composed of six members, while the other counts were required to be tried by a jury composed of twelve members. As such, count three was triable by a different mode of trial. See State v. Woods, 08-718, pp. 7-8 (La.App. 5 Cir. 2/10/09), 4 So.3d 248, 252, writ denied, 09-837 (La.1/29/10), 25 So.3d 831. Nevertheless, LSA-C.Cr.P. art. 493.2 permits the joinder of these offenses if they “are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.” As our discussion in the previous assignment of error makes clear, the Kings Road robbery-homicide and the Monterey Court triple homicide constituted parts of a common plan. Accordingly, we find these offenses were properly joined pursuant to LSA-C.Cr.P. art. 493.2.
However, a defendant properly charged in the same indictment with two or more offenses pursuant to LSA-C.Cr.P. art. 493.2 may nonetheless move for a severance of offenses under LSA-C. Cr. P, art. 495.1, which provides: “If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may border separate trials, grant a severance of offenses, or provide whatever other relief justice requires.” Woods, 08-718 at 7, 4 So.3d at 252.
In ruling on a motion to sever, the trial court must weigh the possibility of prejudice versus the important considerations of judicial economy and administration. State v. Washington, 386 So.2d 1368, 1371 (La.1980). Factors to consider in determining whether prejudice results from a joinder of offenses are: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, considering the nature of the charges, the charging of several crimes would make the jury hostile. State v. Burks, 04-1435, p. 7 (La.App. 5 Cir. 5/31/05), 905 So.2d 394, 399, writ denied, 05-1696 (La.2/3/06), 922 So.2d 1176. In addition, it must be considered that prejudice from the joinder of offenses can be mitigated by clear jury instructions and by an orderly presentation of evidence by the State. State v. Horton, 458 So.2d 445, 447 (La.1984).
A defendant alleging a prejudicial join-der of offenses has a heavy burden of proof. Burks, swpra. Motions to sever under LSA-C.Cr.P. art. 495.1 are within the sound discretion of the trial court and its ruling will not be disturbed on appeal absent an abuse of discretion. Id.
Here, although there were separate facts surrounding each of the charged offenses, the evidence presented at trial established a broad criminal conspiracy in which several individuals committed various offenses in furtherance of that conspiracy. We find this interconnected nature of the offenses favors joinder, as does the number of offenses for purposes of judicial economy.
We also find that any possibility of prejudice was mitigated by the jury | ^instructions and the State’s orderly presentation of the evidence. The jury instructions listed the eight crimes with which defendant was charged, along with the responsive verdicts for each offense. And for the charges of second degree murder and attempted second degree murder, the *85 instructions specified the victim of each offense. The instructions also provided the elements for each charged offense as well as the elements for each responsive verdict. The jury also received eight separate verdict sheets, each indicating the charged offense and the responsive verdicts. And for the charges of second degree murder and attempted second degree murder, the verdict sheets specified the victim of each offense.
On account of this, any possible juror confusion was minimized. The jury returned eight separate guilty verdicts, indicative of the jurors’ understanding that defendant was charged with eight separate offenses requiring eight separate verdicts. See State v. Schneider, 542 So.2d 620, 622 (La.App. 5 Cir.1989), writ denied, 548 So.2d 1245 (La.1989) (recognizing that jury instructions and separate verdict sheets mitigated prejudice from joinder of three armed robbery offenses).
Prejudice was further mitigated by the State’s orderly presentation of the evidence. With a few exceptions, each State witness testified regarding one of the charged crimes; and because evidence of the crimes inevitably overlapped, the State minimized confusion by presenting the evidence in chronological order divided into three parts. The State first presented evidence of the January 2009 robbery-homicide. The State next presented evidence of the April 2009 triple homicide. And the State concluded with evidence tying these crimes together to form the conspiracy charge. By presenting the evidence as a logical and cohesive narrative, the evidence pertaining to each count and victim was readily discernible as separate and distinct.
|3nIn regard to defendant’s argument that the joinder of the offenses allowed the jury to infer a criminal disposition as well as made the jury hostile, defendant does not specify anything in the record to support this. Nor do we find in the record any evidence indicating that the jury was hostile or incapable of considering multiple offenses 'without inferring a criminal disposition. Defendant has not borne his heavy burden of proving he was prejudiced by the joinder. Accordingly, we find that the trial court did not abuse its discretion in denying defendant’s motion to sever. This assignment of error lacks merit.

Errors Patent

We have reviewed the record for errors patent, according to LSA-C.Cr.P. art. 920, and note the following.
Neither the transcript nor the commitment reflects that defendant was advised of the time period for seeking post-conviction relief as required by LSA-C.Cr.P. art. 980.8. It is well-settled that if a trial court fails to advise, or provides an incomplete advisal, pursuant to LSA-C.Cr.P. art. 930.8, this Court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion. See State v. Jacobs, 07-887, p. 98 (La.App. 5 Cir. 5/24/11), 67 So.3d 585, 600, writ denied, 11-1753 (La.2/10/12), 80 So.3d 468.
Thus, by means of this opinion, we hereby inform defendant that no application for post-conviction relief, including an application for an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence have become final under the provisions of LSA-C.Cr.P. arts. 914 or 922.
We also note that defendant, a juvenile at the time of the offenses,[5] was *86 |S1 convicted of four counts of second degree murder and sentenced to four consecutive sentences of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence as mandated by LSA-R.S. 14:30.1. Less than a year after these sentences were imposed, the United States Supreme Court ruled that “the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders” convicted of homicide. Miller v. Alabama, — U.S. -, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012). The Miller Court did not, however, eliminate the possibility that a sentencing judge could sentence a murderer, who was a juvenile at the time of the offense, to life imprisonment, in certain instances. The Miller Court stated, “a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles.” Id. at 2475.
We recently addressed this issue in State v. Williams, 12-355, p. 9 (La.App. 5 Cir. 12/11/12), 106 So.3d 1090, 1095, where the defendant juvenile had been convicted of second degree murder and sentenced, before Miller became law, to life imprisonment without benefit of parole, probation, or suspension of sentence. The defendant did not assign as error on appeal his life sentence without the benefit of parole, so we addressed only the error patent revealed in his sentence. Id., 12-355 at pp. 9-10, 106 So.3d at 1095. We vacated the portion of the defendant’s sentence that removed any meaningful opportunity to secure release, i.e., parole, and remanded the matter to allow the trial judge to consider a sentence that might allow parole eligibility. Id., 12-355 at pp. 10-11, 106 So.3d at 1096.
In the instant case, as in Williams, defendant did not assign as error on appeal the restriction of parole benefits with respect to his life sentences. Accordingly, we will address only the error patent revealed in those sentences.
| ^Defendant’s convictions are affirmed. Defendant’s sentences on counts two, three, seven and eight are affirmed. However, because defendant, a juvenile at the time of the offenses, received four life sentences all without the possibility of parole, pursuant to Miller and Williams, as to counts one, four, five and six, we vacate the portions of defendant’s sentences that eliminate parole eligibility and remand that portion of defendant’s sentences to the trial court for resentencing in conformity with Miller v. Alabama, supra.

CONVICTIONS AFFIRMED; SENTENCES VACATED IN PART; REMANDED WITH INSTRUCTIONS

. Defendant was originally indicted on January 7, 2010, with one count of second degree murder and one count of attempted second degree murder in district court case number 10-0062 of the 24th Judicial District Court. Defendant pled not guilty to these charges on February 24, 2010. On June 20, 2011, these charges were dismissed when the June 16, 2011 superseding bill of indictment was returned. However, all motions and rulings from case number 10-0062 were adopted and incorporated into the record of the present matter.

. The victims’ initials, as well as the initials of the victims' family members, are used under the authority of LSA-R.S. 46:1844(W)(3), which allows the Court to identify a crime victim who is a minor, or a victim of a sex offense, by using his or her initials.

. Wilson was cleared as a suspect in the Kings Road robbery-homicide despite being found in possession of the murder weapon because it was confirmed that he was imprisoned in Baton Rouge on January 15, 2009.

. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

. Defendant’s date of birth is September 25, 1992. Thus, at the time of the offenses, he was 16 years old.