MARC E. JOHNSON, Judge.
| gDefendant, Kendrick K. Henry, appeals his conviction for conspiracy to commit second degree murder from the 24th Judicial District Court, Division “I”. For the following reasons, we affirm Defendant’s conviction and sentence.
FACTS AND PROCEDURAL HISTORY
In July 2009, Tremika Lang gave Marvin Hudson approximately $7,200.00 to purchase a car for her at an auction. Marvin Hudson did not deliver a car to Ms. Lang. Thereafter, Ms. Lang’s attempts to contact Marvin Hudson were unsuccessful. Mr. Hudson’s live-in girlfriend, Rose Grace, received calls and text messages from Ms. Lang looking for him and seeking her car or the return of her money.
Ms. Lang and Defendant, her boyfriend at the time, began text messaging each other regarding Mr. Hudson. These text messages revealed Defendant’s desire to seek revenge on Mr. Hudson for his failure to deliver the vehicle to Ms. Lang or return her money. On July 29, 2009, a shooting occurred at 3601 Tulane |3Prive in Kenner, Louisiana, the residence of Mr. Hudson and Ms. Grace. Mr. Hudson was not injured; however, his brother, Jonathan Hudson, was killed, and Michael Cau-ley was injured. Athough witnesses described seeing two male gunmen, no one was ever identified as the shooters.
On November 24, 2009, the Jefferson Parish District Attorney filed a bill of information charging Defendant along with his co-defendant, Tremika D. Lang, with conspiracy to commit second degree murder, a violation of La. R.S. 14:26:30.1. Defendant was arraigned on November 25, 2009 and pleaded not guilty. Defendant filed an omnibus motion and an order for pre-trial motions. The trial court heard and denied Defendant’s motion to suppress evidence on May 13, 2010. The trial court heard and denied Defendant’s motion to suppress statements on August 19, 2010. On August 23, 2011, the State orally moved to sever the defendants, and the trial court granted the motion.
Defendant proceeded to a jury trial on August 23-26, 2011. A 12-person jury found Defendant guilty as charged on August 26, 2011. On September 6, 2011, Defendant filed a motion for new trial, which was denied on that same date. Defendant was sentenced on September 6, 2011 to 13 years imprisonment at hard labor with credit for time served. On September 15, 2011, the trial court granted Defendant’s timely motion for appeal. Defendant now appeals his conviction.
Based on the text messages and communications between Defendant and Ms. Lang, he was convicted of conspiracy to commit second degree murder of Mr. Hudson. The following testimony was presented at trial.
Sergeant Brian McGregor with the Ken-ner Police Department participated in the investigation of the shooting death of Jonathan Hudson on July 29, 2009, at 3601 Tulane Drive in Kenner, Louisiana. Witnesses at the scene reported several vehicles leaving the location following the shooting. Sergeant McGregor testified |4that when he arrived on the scene, there was a white SUV parked in the street and a U-Haul parked in the driveway of the house. Twenty-five bullet casings were recovered, indicating that at least 25 *715 rounds had been fired across an entire residential lot, and projectiles were recovered from the neighboring home. Detectives went to Kenner Regional Medical Center and reported that two individuals had been shot. Jonathan Hudson died at the hospital of his gunshot injuries. Michael Cauley was also shot, but he survived. Marvin Hudson and Claude Samu-els were also at 3610 Tulane Drive in Kenner at the time of the shooting, but they were not injured.
Witnesses described seeing two male gunmen. Four individuals were developed as suspects during the investigation based on interviews conducted: Brian Harris, Arzia Harris, Eric Anderson, and Defendant. Mr. Cauley, Marvin Hudson and Mr. Samuels were shown photographic lineups but were unable to identify either of the shooters. Sergeant McGregor testified that the vehicle used in the shooting was described as a dark colored vehicle and was identified as having a temporary tag in the back window.
At the scene of the shooting, Sergeant McGregor interviewed Rose Grace, Marvin Hudson’s live-in girlfriend. She told him there were two ladies who had been to her door complaining about things on two different occasions. Ms. Grace described one female that appeared at her door as slim build, 5'5", with dark skin. Ms. Grace told Sergeant McGregor that she recognized the voice of that female as the same woman who had been calling and texting her in reference to a failed vehicle purchase involving Marvin Hudson. Sergeant McGre-gor identified the female as Tremika Lang.
Based on the calls and text messages Ms. Grace had been receiving, Sergeant McGregor sought and obtained subscriber information and telephone | ¡^information from a number of different cellular telephones. Sergeant McGregor ultimately obtained subpoenas for the cellular telephone records of Ms. Grace, Ms. Lang, Defendant, Arzia Harris, and someone named “Reginald.[1]”
In response to the subpoenas, the police department received the cellular telephone information of those individuals, including call logs, voicemails, and text messages. Sergeant McGregor sorted through the material produced and prepared a summary of the calls and text messages between Defendant, Ms. Lang, and Ms. Grace, as well as between Defendant, Ar-zia Harris and someone named “Reginald.” Between July 23, 2009, and shortly after the crime occurred on July 29, 2009, there were 117 texts and 144 calls from Defendant to Ms. Lang, and 233 texts and 246 calls from Ms. Lang to Defendant. There were nine texts, one call, and four voice-mails from Defendant to Ms. Grace, and ten texts from Ms. Grace to Ms. Lang. There were two texts and 21 calls from Defendant to Arzia Harris, and 12 calls from Mr. Harris to Defendant. Finally, there were 28 texts and 63 calls from Defendant to “Reginald,” and 66 texts and 88 calls from “Reginald” to Defendant.
Sergeant McGregor testified that he considered the texts between Ms. Lang and Defendant to be noteworthy communication. He testified Ms. Lang tells Defendant in the text messages how she met a man who was selling auction vehicles, and that she had paid him “7 stacks,” which was determined to be over $7,000.00, but was then unable to get in contact with the individual. She conveyed to Defendant that she wanted to get either the car or her money back. Sergeant McGregor de *716 termined from the series of texts that Defendant was upset with the deal and asked Ms. Lang if she had a receipt showing that she paid the individual for the vehicle. Ms. Lang asked Defendant not to worry about it and not to bring it | nup because it was a surprise for a birthday, so she did not want to tell him; however, she was getting worried.
Sergeant McGregor testified that these text messages indicated that “somebody’s going to die if they’re playing games.” At trial, Sergeant McGregor read the pertinent text messages aloud, and the State presented the printed text messages to the jury.[2] Sergeant McGregor testified that he considered each of these text messages to be significant in his investigation of this case.[3]
On July 29, 2009, Defendant, Ms. Lang, and “Reginald” placed telephone calls to each other. Sergeant McGregor testified that it was significant that they moved from text messaging to telephone calls on July 29, 2009, the date of the homicide. On that date, Ms. Lang placed 14 calls to Defendant throughout the day. Defendant placed 17 calls to Ms. Lang and two calls to “Reginald” at various times throughout the day. “Reginald” placed nine calls to Defendant on July 29, 2009. There were also calls made amongst these parties on July 30, 2009. On that day, Ms. Lang placed nine calls to Defendant. Defendant placed seven calls to Ms. Lang. “Reginald” placed three calls to Defendant, and Eric Anderson placed two calls to Defendant on July 30, 2009. Additional text messages were sent amongst the parties on July 30, 2009.
Sergeant McGregor testified that he learned that Defendant and Ms. Lang left town in the days after the July 29, 2009 shooting. He learned that Ms. Lang and Defendant had gone to Atlanta because they had been threatened. Sergeant McGregor testified that Ms. Lang was found on August 19, 2009 working at Loomis Armor Car in Baton Rouge. Ms. Lang was interviewed at that time. A 17warrant for her arrest was then obtained and Ms. Lang was arrested in September 2009.
Sergeant Michael Cunningham of the Kenner Police Department also participated in this investigation. Sergeant Cunningham went to the scene, met with detectives and spoke with witnesses. Sergeant Cunningham testified the witnesses reported that the shooters actually parked in the middle of the street and got out of the car with two black AK-47’s. The shooters fired 26 times, shooting the cars the victims were in, the house where Ms. Grace was located, a vehicle in the neighbor’s driveway, and the neighbor’s house. The shooters then got back into the car and left.
Sergeant Cunningham testified at trial that he was unable to identify who actually killed Jonathan Hudson. The text messages and incoming phone calls placed to Ms. Grace’s phone led to the conclusion that Defendant and Ms. Lang were suspects. Sergeant Cunningham testified that during the investigation, nothing came up to indicate drug involvement or to indi *717 cate that anyone else was looking to kill Jonathan Hudson, Marvin Hudson, or Mr. Cauley. Defendant and Ms. Lang were ultimately arrested for criminal conspiracy to commit second degree murder.
The information from the text messages also led the investigation to 5413 Urquhart Street in New Orleans, Louisiana. A search warrant was obtained by Sergeant McGregor and Detective Kevin Burns of the New Orleans Homicide Division for 5413 Urquhart Street in New Orleans, Louisiana, where Defendant was believed to reside. An AK-47 was found at that address with the serial number filed off, and the ammunition found in the weapon was of the same class as what was used in the shooting. However, testing ultimately showed the gun|sfound was not involved in the shooting on Tulane Drive.
A photographic lineup was compiled with Defendant’s picture, as well as the pictures of other men who lived at the Urquhart address.[4] No one identified any of these individuals as the shooters. Sergeant Cunningham testified that the vehicle used in the shooting, with the temporary tag in the back windshield, was never located. Defendant had a 1997 white Pontiac Grand Prix that had been stolen and stripped in Atlanta following the shooting. Since they were looking for a dark vehicle allegedly used in the shooting, Sergeant McGregor did not think the stolen vehicle in Atlanta was relevant.
Sergeant Cunningham testified that he called Ms. Lang at the number he received from Ms. Grace and told her that her name had come up in a homicide investigation in Kenner based on text messages pertaining to Marvin Hudson. Ms. Lang told Sergeant Cunningham she only knew of “Marvin” and did not know his last name. She said he lived in Kenner but stated she had never been to his house. She explained she was texting Marvin about $7,200.00 she had given him for a car he was supposed to deliver but never did. Ms. Lang told Sergeant Cunningham she was at her mother’s house, would be late, and could not meet with him. Sergeant Cunningham then asked her to call him back as soon as possible; however, Ms. Lang did not call him back.
Defendant then called Sergeant Cunningham and asked why he needed to speak with Ms. Lang. Sergeant Cunningham explained the situation to Defendant and explained that he needed to speak with him as well because his name had also come up with the phone records and text messages obtained. Defendant told Sergeant Cunningham that he never met Marvin Hudson, and he only knew of him from what Ms. Lang had told him about the agreement regarding the car. 1 ^Defendant also told Sergeant Cunningham he had never been to Kenner. Sergeant Cunningham asked Defendant about the 5413 Urquhart Street residence, and Defendant said he knew people that lived there, but he did not live there. Sergeant Cunningham told Defendant the murder was committed with an AK-47 and that an AK-47 had been found at 5413 Urquhart, as well as other items in the house with Defendant’s name on them. Defendant then told Sergeant Cunningham that he and Ms. Lang were on their way to Atlanta and were leaving town because somebody was asking about a “girl that drove a white Oldsmobile with a butterfly sticker on the back.” Ms. Lang drove such a car, so Defendant said he felt their lives were in danger.
*718 Defendant explained that Ms. Lang was traveling in a car behind him. Sergeant Cunningham indicated how important it was that he speak with Defendant. Defendant stated he would call back, but he never did. Sergeant Cunningham then called Ms. Lang and asked if she was at her mother’s house or going to Atlanta. Ms. Lang admitted she was going to Atlanta. She again explained how she knew Marvin Hudson and explained the deal with the money she had given him. However, this time, she admitted to Sergeant Cunningham that she had gone to Marvin Hudson’s house one time. Ms. Lang told Sergeant Cunningham she and Defendant would call him back, but they never did.
Arrest warrants for Defendant and Ms. Lang were ultimately obtained on September 18, 2009. Ms. Lang was arrested in Baton Rouge on September 25, 2009. Defendant was arrested in Atlanta and transported to Louisiana on October 9, 2009. Sergeant Cunningham met with Defendant following his return. Defendant told Sergeant Cunningham that he did not know Marvin Hudson and only knew that Ms. Lang had given him money. Defendant stated he was trying to |1ftget the money back. He admitted he sent the text messages but said he did not mean anything by them, did not go to Kenner, and did not kill anyone.
Ms. Grace testified at trial that she and Marvin Hudson lived together at 3601 Tulane Drive in Kenner, Louisiana with their six children. On July 29, 2009, at the time of the shooting, Ms. Grace was inside the house with five of her children. She testified that she and Marvin Hudson were moving, and Jonathan Hudson, Michael Cauley and Marvin Hudson were leaving after they packed the U-haul truck. She then heard one of the men say, “Y’all watch out,” and she heard gunshots. Ms. Grace did not see who was responsible for the shooting. Ms. Grace testified that she called the police once she located her cell phone. Ms. Grace then went outside and told the kids to get into the truck because she was concerned for their safety. She put the children in the truck with the intention of meeting everyone at the hospital. She pulled away from the house and got approximately two houses away when the police stopped her. She returned to the house at that time and spoke with the police.
Ms. Grace testified that prior to the shooting, a woman had come to her door wanting to get in touch with Marvin Hudson. Ms. Grace testified that the woman also called and texted her looking for Mr. Hudson. A man had also sent her text messages and left voicemails looking for Mr. Hudson. Ms. Grace thought the woman was just a bitter female, so she told the woman not to call that phone anymore. Ms. Grace testified that at first the woman just asked if she knew where Mr. Hudson was located; so, she told the woman she would try and get in touch with him. The woman then began text messaging her. Before the shooting, Ms. Grace testified that she received a phone call from the woman saying she was sitting outside with her boyfriend, and she said “I’m waiting on you.” Ms. Grace | ^testified that a man got on the phone and said, “he just wanted to talk.” Ms. Grace testified that she was not in town or at the house when she received the call.
Ms. Grace then testified that a woman came to her door around 7:30 a.m. one morning. Ms. Grace said she was angry at the woman because she was sleeping at the time. The woman asked for Mr. Hudson. Ms. Grace told her Mr. Hudson was not home, and the woman inquired as to what time he would return. Ms. Grace responded that she did not know and told the woman, “whatever your issue is, it’s with *719 him. He sells cars. I do accounting.” She told the woman to “take it up with” Mr. Hudson because she did not have anything to do with it. Ms. Grace testified that she does not ask about her husband’s business.
Ms. Grace testified that she received multiple text messages asking for either the car or $7,200.00 from Marvin Hudson, but she did not recall them in detail. She stated that she received a lot of text messages that started out with, “Do I know where he at?”, “Answer the phone. You know I’m calling.”, “I just want my money, or I’m calling my people from Atlanta”, or “It’s going down.” Ms. Grace was asked at trial if anyone other than this woman had come to her house complaining of a bad business deal, and she responded “not to my knowledge.”
At trial, Ms. Grace testified she felt harassed by the person contacting her indicating she was trying to contact Marvin Hudson. She testified that she was not involved in any transactions between Mr. Hudson and the people sending the text messages. She stated it was bothersome, but she did not consider it her business. At trial, the defense stipulated that Ms. Lang was the person who appeared at Ms. Grace’s door looking for Mr. Hudson regarding the car and $7,200.00.
Ms. Lang testified at trial that Defendant was her boyfriend in July 2009. In [ 1⅞2009, Ms. Lang decided she wanted to buy a new car and Aaron[5], a friend from high school, told her that his car came from an auction. Aaron called Marvin Hudson and told him he knew of someone who wanted to get a car from him. Ms. Lang spoke with Mr. Hudson on the phone and planned to meet him. Ms. Lang testified that Marvin Hudson sent her a picture of the car by phone. She liked the car and asked if he could get it for her. Marvin Hudson said “ok,” told her how much the car cost, and told her he needed $1,000.00 to put down on the starting bid. Ms. Lang gave Mr. Hudson $1,000.00. Mr. Hudson did not give Ms. Lang a receipt, but Ms. Lang said she trusted him. Ms. Lang testified that Mr. Hudson then told her he needed an additional $6,200.00 to get the car and have it fixed. Ms. Lang said she trusted Mr. Hudson, so she gave him the money. After she gave Mr. Hudson the $6,200.00, Ms. Lang testified she never saw him again.
Ms. Lang testified that she expected to receive the car about a week after she gave Marvin Hudson the $6,200.00. When the car was overdue, she started calling the telephone number she had for Mr. Hudson, and she learned the number actually belonged to Ms. Grace. Ms. Grace never told Ms. Lang that Mr. Hudson lived with her. Aaron attempted to find Marvin Hudson for Ms. Lang but was unsuccessful, although he did tell Ms. Lang where Marvin Hudson’s house was located. Ms. Lang went to his house at 7:30 a.m., and the lady at the house told her Marvin Hudson was out of town. Ms. Lang testified that she had no trouble getting in touch with Marvin Hudson until after she gave him the money.
Ms. Lang testified that she did not file a complaint with the police regarding Marvin Hudson taking her money and not delivering a car because people were telling her she had no proof to show that she had given Mr. Hudson any money. 11sMs. Lang stated that she and Defendant continued looking for Mr. Hudson to see if she could get her the money or the car.
Ms. Lang also wrote a letter to Ms. Grace letting her know that she was looking for Marvin Hudson and asked Ms. *720 Grace to get in contact with him. Ms. Lang admitted that she sent a text message regarding the letter to Ms. Grace asking why no one had called her back. Ms. Lang testified that she went to Ms. Grace’s house two times, one time she spoke to Ms. Grace and the other time she left the letter. She testified that she did not go to Ms. Grace’s house with Defendant and did not call her from in front of the house. Ms. Lang testified that she started to feel like Ms. Grace was lying 'to her about never talking to Mr. Hudson. Ms. Lang admitted she went to Ms. Grace’s house at 7:30 a.m. on a weekend and sent text messages to her at 10:00 or 11:00 p.m. However, she does not remember texting Ms. Grace in the middle of the night or at 6:30 a.m., and she testified that she was not harassing Ms. Grace.
At trial, Ms. Lang admitted that she sent the text messages that were obtained by subpoena and presented as evidence by the State, although she denied that the text messages were threatening. Ms. Lang testified that she started getting overwhelmed and aggravated and she got to the point where she started giving up. Ms. Lang testified that she was trying to say something by text to Marvin Hudson to make him answer her because he and Ms. Grace were ignoring all of the phone calls from her. Ms. Lang testified that she only said she was going to call people in Atlanta to see if she could get them to call her back. She testified that she did not know anyone in Atlanta. Ms. Lang testified that she did not consider “call my people from Atlanta” as a threat. She also testified that her text messages did not mean anything pertaining to violence.
|14Ms. Lang testified that Defendant was upset with her when he found out she had given Marvin Hudson $7,200.00. But, Ms. Lang stated she does not remember Defendant sending her texts or her sending Defendant texts regarding killing Mr. Hudson. Ms. Lang stated that if she would have sent one of those texts, she would have been talking about something else, not killing Mr. Hudson. Ms. Lang said she was hurt and was expressing the way she felt at the time by sending text messages to Defendant, and the text messages Defendant sent her were intended to make her feel better.
Ms. Lang admits to sending a text back to Defendant saying, “I never thought I will be like dis, but I’m ready to my kill something....” However, Ms. Lang testified that she does not remember Defendant sending her a text message two days before the murder saying, “After 2day or tomorrow I’m going kill him.” Ms. Lang also stated she did not think she responded to this text. However, the State presented State’s Exhibit 67, which was a text message from her to Defendant stating, “Okay. Cool.” Ms. Lang then agreed that this text message could be a response to Defendant’s text regarding killing Mr. Hudson after “2day or tomorrow.” Ms. Lang testified that Defendant talked a lot of “bullcrap,” and she did not take him seriously. She testified that she did text Defendant about stopping to see a guy that knew Marvin Hudson because she was still trying to get the car or her money back. Ms. Lang admits Defendant sent a text back to her in response stating, “no, we not doing dat. If we kill him everybody gon say who dey knew cam lookn 4 him.” Ms. Lang did not agree that Defendant’s intentions were to kill Marvin Hudson. She again stated Defendant talks a lot of “bullcrap” at times. Ms. Lang testified she never responded to Defendant or sent a text message telling him that they should not talk like that, or to say that she wanted to get her 115money back the right way.
*721 Ms. Lang also testified that she did not want Mr. Hudson killed. She testified that she was “venting out” and expressing the way she was feeling, but she said she did not take steps towards killing Marvin Hudson. In reference to the text message she sent to Defendant stating, “... if nothing don’t pop off by Thursday, then he get popped,” Ms. Lang explained that she meant that she “gives up.” Ms. Lang testified she was getting more upset and sad and was speaking out of anger. Ms. Lang testified that she sent a text to Defendant the day before the murder stating, “U <& aaron em going look for him today?” She clarified that “him” referred to Mr. Hudson. She had also discovered from Aaron that someone else was also looking for Mr. Hudson.
Ms. Lang maintained that she was only looking for Marvin Hudson because she wanted her money or her car, not because she wanted to harm him. Ms. Lang admitted she sent a text to Defendant stating, “I want my money & I wanna kill him ...,” but she stated she was still not talking about murdering anyone. Instead, Ms. Lang explained that she did not say she was going to kill him, only that she wanted to kill him because that was how she felt. Ms. Lang testified that Defendant understood she did not want to kill anyone, and she did not take Defendant’s text messages seriously. She believed Defendant was just trying to make her feel better and console her when he sent her a text message stating, “Chill if we find em we find em but we will kill him.” Ms. Lang further testified that she did not take Defendant seriously when he texted her saying “Dey gon get bullets,” and she responded, “Kool.” Ms. Lang explained that she was joking when she sent a text message to Defendant regarding giving “Anthony” and “Eric” something, maybe even her car. She claimed she was only referring to Anthony 11fiand Eric helping her search for Mr. Hudson. Ms. Lang explained that Anthony Hodge was someone she went to school with, and Eric was someone she knew from the neighborhood.
Ms. Lang also sent a text message to Defendant stating, “They gotta up they vehicles and they life, I’m sorry....” Ms. Lang admitted “they” referred to Marvin Hudson and Ms. Grace, but she explained that she did not necessarily want them killed. Ms. Lang remembered Defendant telling her to stop calling and texting Marvin Hudson, but she explained that Defendant just wanted her to express how she was feeling to him and nobody else. She claimed Defendant did not tell her to stop texting because it was about details of what was to happen to Marvin Hudson.
On July 29, 2009, the day of the shooting, at 4:55 p.m., Ms. Lang sent a text to Defendant saying, “Dats my last text to him.” Ms. Lang testified that it was her last text to Marvin Hudson because she was giving up, letting it go, and taking it as a loss. She testified that she changed her text message signature line to “Live and Learn” because the longer she lives, she learns she cannot trust anyone. Ms. Lang testified that the night Jonathan Hudson was killed, she had no idea in advance that anyone would be killed. Ms. Lang testified that Defendant did not do anything wrong and did not follow through on his statements regarding killing Marvin Hudson. Ms. Lang also testified that Defendant did not send anyone to shoot Marvin Hudson.
After the day of the shooting, Defendant sent Ms. Lang text messages referencing the removal of a butterfly sticker and special rims from her car that were distinctive because someone might remember if they saw the car. Ms. Lang removed the butterfly sticker after she heard the rumors. Ms. Lang also approached her landlord *722 and said she wanted to move out immediately because she 117believed her life was in jeopardy, and someone was going around the neighborhood saying they knew where she worked and lived.
Ms. Lang testified that she was not engaged in criminal activity that would cause bad people to come looking for her, but she did not call the police after hearing the rumors because she did not know who was looking for her. She did not know the reason people might come looking for her and Defendant was the only one who said people were looking for her. She decided to go to Atlanta, Georgia because she was afraid someone might “just pop upon” her one day after work. Ms. Lang packed two to three outfits, and she and Defendant went to Atlanta in separate cars. Ms. Lang testified that she had no knowledge of Defendant transporting a gun from New Orleans to Atlanta.
John Randstadler, a retired Fulton County police officer in Georgia, testified at trial that he was working vehicle thefts in September 2009 when Defendant filed a complaint that his vehicle, a white Grand Prix, had been stolen. Mr. Randstadler spoke with Defendant, and the car was eventually recovered. When he first spoke with Defendant by phone before the car had been recovered, Defendant said nothing about a missing AK-47. After the car was recovered, but before Defendant saw the vehicle, Defendant told Mr. Randsta-dler that there previously was an AK-47 in the car but it was now missing. Mr. Randstandler met with Defendant at the storage unit where the vehicle was located, and Defendant said he had already looked through the car and the AK-47 was missing. Defendant told him there was a gun behind the seat when the vehicle was stolen; but after the vehicle was recovered, the gun was no longer behind the seat.
Michael Cauley testified at trial that he was shot five times on July 29, 2009. He was outside of his car, in front of Marvin Hudson’s house and did not |1sknow who shot him. Mr. Cauley, Jonathan Hudson and some other men were helping Marvin Hudson move when the shooting occurred. Mr. Cauley described himself as a “career criminal.” Mr. Cauley testified that he last went to jail for the sale of crack cocaine. Mr. Cauley stated he knew Marvin Hudson and had started hanging out with him about two years before. Mr. Cauley testified that he did not know about Marvin Hudson’s business and had met him on the “streets.”
Erika MeGraw testified that she was with Jonathan Hudson for seven years and is the mother of one of his children. Ms. MeGraw testified that Jonathan Hudson did not engage in drug dealing, crimes of violence, or any other criminal activity. Ms. MeGraw further testified that she knew Marvin Hudson sold cars, but she did not know anything about the day to day transactions. She also stated that she had known Mr. Cauley for about a year at the time of the shooting. Ms. MeGraw testified that Marvin Hudson and Ms. Grace were moving at the time of the shooting and Jonathan Hudson was there to help them pack. Ms. MeGraw was not there at the time of the shooting and she had no information about the shooting itself.
ASSIGNMENT OF ERROR
On appeal, Defendant alleges the trial court committed reversible error when it accepted the jury’s guilty verdict against him, even though the record established that no overt act was committed by him, and it was actually Ms. Lang who threatened Marvin Hudson and his family.
*723 LAW AND ANALYSIS
Defendant requests that this Court vacate his conviction for conspiracy to commit second degree murder because the State failed to present sufficient facts to adequately show he committed an overt act geared towards the commission of a lacrime. He argues it was manifest error for the jury to conclude he conspired with Ms. Lang to hire or solicit people to kill or injure Marvin Hudson when the evidence at trial established that- Ms. Lang carried the grudge against Marvin Hudson, and there were other people who may have decided to violently confront him on that day. Defendant further argues that the bill of information does not indicate how the conspiracy was formed or how Defendant performed an act to assist Ms. Lang in carrying out the conspiracy. Defendant argues that without such an act, the State’s case against him must fail. Defendant contends that he did not engage in any action directed towards harming or killing Marvin Hudson. He argues the State had written statements or communications from Ms. Lang to Ms. Grace and from Ms. Lang to Defendant, but no overt acts by Defendant. Defendant suggests that the “overt act” contemplated by the statute involves an action in furtherance of the conspiracy and not just a statement in furtherance of a conspiracy. Defendant argues Ms. Lang was the only one that made an “overt expression” of intent to harm Marvin Hudson when she went to his house to confront him about her money or car. Defendant argues that even then, her intent was not to plot to do Marvin Hudson harm.
Conversely, the State argues an overt act, in the context of a conspiracy, may be any act such as a visit by one party to a co-conspirator for the purpose of discussing details. The State contends the text messages in which Defendant and Ms. Lang discussed and planned Marvin Hudson’s murder should be considered overt acts in furtherance of the conspiracy. According to the State, the text messages reveal the planning of the murder, searching for the victim, as well as surveillance of his residence, which are overt acts in furtherance of a conspiracy to commit murder.
In reviewing the sufficiency of the evidence, an appellate court must | zpdetermine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674, p. 9 (La.6/29/01); 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); State v. Mickel, 09-953 (La.App. 5 Cir. 5/11/10); 41 So.3d 532, 534, writ denied, 10-1357 (La.1/7/11); 52 So.3d 885. Under the Jackson standard, a review of the record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08); 985 So.2d 234, 240. Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. Id. at 240.
Defendant was charged with and convicted of conspiracy to commit second degree murder in violation of La. R.S. 14:26:30.1. Second degree murder is defined, in pertinent part, by La. R.S. 14:30.1 as:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
Criminal conspiracy is defined by La. R.S. 14:26(A) as:
*724 [T]he agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.
Thus, the elements of the crime of conspiracy are: (1) an agreement or combination of two or more persons for the specific purpose of committing a crime, plus (2) an act done in furtherance of the object of the agreement or combination. State v. Tatum, 09-1004 (La.App. 5 Cir. 5/25/10); 40 So.3d 1082, 1089.
The first element of conspiracy requires specific intent, which is defined as the “state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” State v. Zeno, 99-69 (La.App. 5 Cir. 8/31/99); 742 So.2d 699, 704, writ denied, 00-105 (La.6/30/00); 765 So.2d 1065 (citing La. R.S. 14:10(1)). The determination of specific criminal intent is a question of fact and may be inferred from circumstances and actions of the defendant. Id. (citation omitted). Proof of a conspiracy may be made by direct or circumstantial evidence. Id., 99-69 at 7; 742 So.2d at 705 (citation omitted).
The second element of a criminal conspiracy, the overt act, need not be unlawful. It may be any act, innocent or illegal, accompanying or following the agreement, which is done in furtherance of its object. State v. Jackson, 00-221 (La.App. 5 Cir. 3/15/01); 783 So.2d 482, 487, writs denied, 01-1071 (La.5/9/03); 843 So.2d 385, and 01-1258 (La.5/9/03); 843 So.2d 386. In prosecutions for criminal conspiracy, whether an overt act alleged served to support the object of the conspiracy is a question for the jury. State v. Ellis, 94-599 (La.App. 5 Cir. 5/30/95); 657 So.2d 341, writs denied, 95-2095 (La.12/8/95); 664 So.2d 421, and 95-1639 (La. 1/5/96); 666 So.2d 300; State v. D’Ingianni, 217 La. 945, 47 So.2d 731 (1950). The Louisiana Supreme Court has held that:
Any act, such as a visit by one of the parties to his co-conspirator for the purpose of discussing details, might suffice as an overt act to complete a criminal conspiracy....
State v. D’Ingianni, 47 So.2d at 733.
In the instant case, the text messages exchanged between Ms. Lang and Defendant demonstrate that over a matter of days these individuals became increasingly angry over the inability to obtain either the car Ms. Lang purchased l22from Marvin Hudson or the money she paid him. When they were unable to get either the car or the money, Ms. Lang and Defendant began to discuss what actions to take in order to seek revenge. Specifically, the text messages demonstrate a plan between Ms. Lang and Defendant to shoot and kill Marvin Hudson. Ms. Lang and Defendant then discussed how to locate Marvin Hudson. Ms. Lang suggested they contact an individual who knew Marvin Hudson who might know his whereabouts. These text messages indicated a plan to shoot Marvin Hudson. On July 27, 2009, Defendant suggested killing Mr. Hudson within two days. Ms. Lang responded “ok,” suggesting her acceptance of the plan. Defendant later stated that “they” will get bullets, to which Ms. Lang responded, “kool.” This again suggests that Defendant and Ms. Lang were planning the shooting and killing of Marvin Hudson.
At trial, Ms. Lang admitted to sending and receiving the text messages. She asserted that she did not take Defendant seriously, although at no time did she re *725 spond to Defendant and indicate she did not agree with his plan to shoot Marvin Hudson. When read together however, the jury clearly found that this correspondence between Ms. Lang and Defendant demonstrated an agreement between them to carry out the plan of killing Marvin Hudson. Additionally, it was demonstrated at trial that Defendant and Ms. Lang completed acts in furtherance of this agreement. The text messages demonstrate that Ms. Lang and Defendant were actively searching, or having others search, for Marvin Hudson in order to carry out their plan to shoot him.
Based on the above, we find that the evidence presented at trial showed that Defendant and Ms. Lang planned to kill Marvin Hudson, or have someone else kill him, and then carried out acts in furtherance of that plan by text messaging and ^searching for Marvin Hudson; thus, Defendant conspired to commit second degree murder. Therefore, viewing this evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found Defendant guilty of conspiracy to commit second degree murder.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990). We have not found any errors patent that require corrective action.
DECREE
For the foregoing reasons, we affirm Kendrick K. Henry’s conviction and sentence.

AFFIRMED

. Sergeant McGregor was unable to obtain accurate subscriber information for "Reginald.”

. The State also admitted into evidence the original phone records for the cellular telephones of Lang, Henry, Grace, and “Reginald.”

. Sergeant McGregor sorted through all text messages contained in the cellular telephone records subpoenaed and prepared a summary of the text messages relevant to the investigation. Those text messages were contained in the police report. Sergeant McGregor then met with the Jefferson Parish District Attorney’s Office and assisted in going through the text messages.

. The photo lineup contained photos of Defendant, Arzia Harris, Brian Harris, and Eric Anderson.

. Aaron's last name is not contained in the transcript.